**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 00-20037

_____

WOMEN'S MEDICAL CENTER OF NORTHWEST HOUSTON; ROBERT P. KAMINSKY,
M.D., on behalf of themselves and the patients they serve; DENTON
HEALTH SERVICES FOR WOMEN; AUSTIN WOMEN'S HEALTH CENTER, P.A.;
LAMAR ROBINSON, M.D.; FRED W. HANSEN, M.D.; L. TAD DAVIS, M.D.;
MARY E. SMITH, M.D.,

Plaintiffs-Appellees,

v.

DR. CHARLES E. BELL, Acting Texas Commissioner of Health; JOHN
CORNYN, Texas Attorney General,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

April 13, 2001

Before WIENER and STEWART, Circuit Judges, and SMITH,[*] District
Judge.

WIENER, Circuit Judge:

Plaintiffs-Appellees ("the plaintiffs") filed suit to
challenge recent amendments to Texas law that for the first time
require them to license their medical offices as abortion
facilities.  The district court entered a preliminary injunction
against enforcement of the amendments, concluding that they violate

_____

[*] District Judge of the Western District of Texas, sitting
by designation.

the plaintiffs' equal protection rights. The court's injunction also prohibits enforcement of three companion regulations that were found to be unconstitutionally vague. We reverse the district court's injunction of enforcement of the amendments grounded in equal protection, but affirm the court's injunction prohibiting enforcement of the regulations grounded in unconstitutional vagueness.

I.

FACTS AND PROCEEDINGS

The plaintiffs are Texas physicians who brought this action on behalf of themselves and their patients pursuant to 42 U.S.C. § 1983. They challenge the constitutionality of 1999 amendments that require them to comply with the Texas Abortion Facility Reporting and Licensing Act, which dates to 1985.[1] The amendments changed the threshold for facilities that must be licensed from those "used primarily for the purpose of performing abortions" — that is, where at least 51 percent of patients treated in a calendar year receive abortions — to those in which more than 300 abortions are performed in any twelve-month period. Facilities in which fewer abortions are performed remain exempt from the licensing requirements.

The record in this case reveals that as of 1999, Texas had between 51 and 59 non-hospital abortion providers, comprising: (a)

---

[1] Texas Abortion Facility Reporting and Licensing Act, Tex. Health & Safety Code §§ 245.001-245.022.

31 licensed abortion facilities; (b) a single-digit "handful" of physicians providing fewer than ten abortions per year in their offices; (c) seven physicians performing more than ten but fewer than 300 abortions per year in their offices; and (d) twelve physicians, or some 20 percent of the total, who for the first time would be required to be licensed as a result of the amendments because each provides more than 300 abortions per year (the new threshold) in their offices, even though in each of these offices abortion patients constitute less than 51 percent of all patients treated (the old threshold). Four of these twelve physicians are the plaintiffs in this case.[2]

To summarize briefly several of the principal requirements of the amended Abortion Facility Reporting and Licensing Act and its regulations, a licensed abortion facility must:

• Prominently post its license and provide each woman who initially consults the facility with a written statement about a toll-free telephone number maintained by the Texas Department of Health, which patients can call for information about a facility's license status, inspection violations, and penalties or other discipline imposed against it.

• Maintain a written Quality Assurance program, implemented by a Quality Assurance committee of at least four members, including

_____

[2] A fifth doctor, Mary E. Smith of Denton, also was a plaintiff, but ceased providing abortions at her private office while this appeal was pending and has been dismissed as a party to the case.

3

a physician and a nurse, who must meet at least quarterly.[3]

• Develop a written staff orientation and training program and written infection control policies and procedures.[4]

• Be subject to annual and surprise on-site surveys by state inspectors.

• Employ staff with specific qualifications, including a physician and a registered nurse or licensed vocational nurse.

In addition, a physician applying for a license must provide personal information, including his home address, Social Security number, date of birth, driver's license number, and Texas physician license number. The initial licensing fee is $1,000, the first annual fee is $1,500, and the annual renewal fee is $2,500. Under the 1999 amendments, operation of an abortion facility without a license is a Class A misdemeanor, punishable by a jail sentence of up to one year and a fine of up to $4,000, or both. Civil and administrative penalties of $100 to $2,500 per day also may be assessed for violations of the statute and regulations.

The practices of the plaintiff physicians vary, but as a group they administer their offices less formally than the regulations require. They insist that many of the administrative mandates in the 1999 amendments are unnecessary to their practices. Some

---

[3] The regulations were revised in 1997, adding the provisions on quality assurance and patients' rights, among other changes. See 25 Tex. Admin. Code. §§ 139.1-139.60.

[4] Facilities must maintain a total of nine administrative, nine clinical, and three additional written policies, covering at least thirty different subjects. 25 Tex. Admin. Code § 139.41.

4

plaintiffs testified that they will have to charge their abortion patients as much as $100 more per procedure to cover the expenses associated with meeting the licensing requirements. The plaintiffs testified that they believe their private-office setting offers patients greater confidentiality, fewer confrontations with protesters, and a more personalized, supportive atmosphere than do abortion clinic settings. Some also objected to the rule that they must prominently display their abortion facility licenses at their offices, fearing that will offend some obstetrical and male patients and thereby damage their practices.

The only plaintiff who testified that he will stop performing abortions in his private office altogether rather than seek a license is Dr. Fred Hansen, an obstetrician/gynecologist with a private gynecology practice in Austin who performs approximately 950 to 1,050 abortions per year. Abortion is one of many gynecological procedures Dr. Hansen provides to his patients. Nearly all of his abortion patients are referred to him by other physicians, many for medically indicated abortions resulting from profound fetal defects discovered in wanted pregnancies after the fifteenth week. Dr. Hansen testified that he is the only physician in Austin who provides abortions in a private office after the fifteenth week of pregnancy. His staff consists of one part-time and three full-time employees. Dr. Hansen expressed the belief that if he were to seek licensing and comply with the continuing requirements of licensing, patient care would suffer as a result of

5

his and his staff's spending additional time on unnecessary administrative tasks.

Evidence heard by the district court regarding the Legislature's purpose in enacting the 1999 amendments reflects that state Sen. Chris Harris filed a Senate bill that would have required all physicians performing more than 10 abortions per year to become licensed. Sen. Harris stated that he was motivated by ongoing concerns about abortion safety, and by data that he interpreted as showing that some physicians were performing large numbers of abortions but escaping the licensing act through the 51 percent "loophole."[5] Sen. Harris stated that he did not want to limit abortion rights, but did want to protect the health and safety of women receiving abortions.

Among those testifying in opposition to the bill was Peggy Romberg, executive director of the Texas Family Planning Association, who stated that she opposed the bill's 10-abortion trigger. In response to questioning by Sen. Harris, she stated that "my bottom ceiling would be about 300, of OB/GYN that provides abortion services that would be essentially about one a working day." Ms. Romberg told Sen. Harris that the number 300 would be "more acceptable" to the abortion rights community than setting the threshold at ten, and later said she suggested the number 300 as a

---

[5] Any physician who executed an affidavit attesting that the number of patients for whom he performed abortions represented less than 51 percent of his patients during the previous calendar year was exempt from the licensing requirements.

"political compromise" with no medical, health, or safety basis.

Sen. Harris's bill did not pass, but similar language regulating physicians who perform 300 or more abortions per year was added by Rep. Leticia Van de Putte to a lengthy House bill dealing with general health department matters. That bill was adopted by both chambers and took effect September 1, 1999. Previously exempt physicians were not required to be licensed until Jan. 1, 2000. Rep. Van de Putte, who characterizes herself as "adamantly pro-choice," testified that she discussed the number 300 with pro-choice advocates and heard no objections.[6] She sought "a number that would not preclude access for women in this state to seek that procedure, but keeping in mind that we wanted to have as our goal [the] health and safety of the women." Rep. Van de Putte also testified that she was influenced in supporting the bill by twenty years of experience as a practicing pharmacist, during which she counseled and dispensed medication to abortion patients.[7]

---

[6] There is no official legislative history on the House bill. The district court denied the plaintiffs' motion to strike the testimony of Sen. Harris and Rep. Van de Putte as inadmissible subsequent legislative history. The court noted that, in determining the legislative purpose in passing the statute, it would rely primarily on the official legislative history in the record and give lesser weight to the legislators' testimony. The official legislative history includes a transcript of a Senate Human Services Committee meeting in which the 1999 amendments to the Abortion Facility Reporting and Licensing Act were introduced as a Senate bill, and materials documenting the 1997-98 ad hoc committee process that promulgated the abortion licensing regulations found in 25 Tex. Admin. Code. §§ 139.1-139.60.

[7] Rep. Van de Putte testified as follows about her view on setting the licensing threshold at 300 abortions per year:

7

Following a two-day hearing, the district court granted the plaintiffs' motion for preliminary injunction barring the defendants from enforcing the 1999 amendments or the three challenged regulations pending a full review of the case on the merits. The court found that the plaintiffs had shown a substantial likelihood of success with respect to their claims that the amendments violate their equal protection rights and are unconstitutionally vague, but not on the claim that the amendments violate the due process rights of the plaintiffs' patients.

More specifically, the court found that, under <u>Planned Parenthood of Southeastern Pennsylvania v. Casey</u>,[8] the plaintiffs had not shown a substantial likelihood of success on the merits of their claim that the 1999 amendments impose an undue burden on a woman's right to abortion. The court concluded that the 1999 amendments were not passed for an improper purpose, and that there was no evidence of any legislative intent to place obstacles in the paths of women seeking abortions. The court also found that the

---

I rationalized that if a physician did one a day for the number of working days, if you take 52 weeks out of the year, and you know, you get five working days, that would leave us with about 260 working days a year. Take off maybe about ten for holidays, that would leave you at 250. So averaging out even one a day would leave you with 250. And I felt that with an adequate buffer zone of an additional 50, would leave us with 300 so that a physician in their office, I felt, could comply with that number of procedures being done and giving adequate care to those women who seek that procedure.

[8] 505 U.S. 833 (1992).

benefits sought by the state in enacting the amendments justified the increased costs that might be borne by physicians or patients, or by Dr. Hansen's likely decision to stop performing abortions in his office rather than become licensed. The court concluded that the amendments do not have the purpose or effect of creating an undue burden on the right of Texas women to seek an abortion, and therefore do not unconstitutionally deny them due process. The court thus denied an injunction grounded in substantive due process because the plaintiffs had failed to show, on behalf of their patients, a substantial likelihood of success on their Fourteenth Amendment due process claim.

The court reached the opposite conclusion on the plaintiffs' equal protection claim. The court applied rational basis review to the physicians' assertion that they had been denied equal protection of the law.[9] These plaintiffs challenged two legislative classifications: (1) physicians who perform abortions in their offices and those who perform other, comparable surgical procedures in theirs, and (2) physicians who perform more than 300 abortions per year in their offices and those who perform 300 or fewer per year in theirs.

As to the first classification, the court noted that Texas's abortion licensing regulatory scheme, which has been in place since 1985, is not being challenged in this case and must be presumed to

---

[9] The court concluded that the doctors did not plead an equal protection claim on behalf of their patients.

9

be constitutional.[10]  Recognizing that the Legislature reasonably could conclude that women receiving abortions in "high-volume" physician offices need more protection than patients undergoing other surgical procedures in such offices, the court held that the classification distinguishing physicians who perform abortions in their offices from those who perform different but comparable surgical procedures in theirs bears a rational relationship to a legitimate state end.[11]

Turning to the second classification, which distinguishes office practitioners who perform more than 300 abortions per year from those who perform 300 or fewer per year, the court concluded that indeed the plaintiffs had shown a substantial likelihood of success on their equal protection claim.  The court found that the record demonstrates no rational connection between 300 abortions and the risks associated with high-volume abortion clinics; neither does it contain any evidence that the twelve physicians who would be newly licensed under the 1999 amendments ever gave substandard care to any abortion patient or had any problems with patient infections.  The court wrote that "the evidence amply supports the proposition that the cutoff would have to be significantly higher than 300 to be held rational."

Considering testimony that abortion clinics might provide as

_____

[10]  Citing Harris County, Tex. v. CarMax Auto Superstores Inc., 177 F.3d 306, 321 (5th Cir. 1999).

[11]  Citing Romer v. Evans, 517 U.S. 620, 632 (1996).

10

many as 35 abortions each working day, wrote the court, one abortion per day cannot be regarded rationally as a heavy workload, so that "[t]his 'one a day' rationale cannot be reconciled with the State's argument that some physicians may be providing so many abortions that they are unable to adequately take care of patients." Furthermore, noted the court, a physician in a general gynecological practice who sees twenty patients and performs only one abortion per day would devote just five percent of his practice to abortion. The court held:

> It cannot be rational to conclude that a physician performing an average of one abortion a day as part of a general gynecological practice is thereby subjecting his patients to the "high volume" risks cited by the state. The Court must conclude that "the facts on which the classification is based could not reasonably be conceived to be true by the decisionmaker."[12]

Based on its determination that the legislative distinction between physicians' offices in which more than and fewer than 300 abortions are performed each year bears no rational relationship to a legitimate state end, the district court concluded that the plaintiffs had shown a substantial likelihood that they would succeed on the merits of their equal protection claim.

The court reached the same conclusion regarding the plaintiffs' claim that three provisions of the Texas abortion licensing regulations are unconstitutionally vague.[13] Those

---

[12]  Quoting Gregory v. Ashcroft, 501 U.S. 452, 473 (1991).

[13]  25 Tex. Admin. Code. §§ 139.1-139.60. The challenged provisions were added to the abortion licensing regulations during a 1997 revision that became effective Aug. 13, 1998. They

11

provisions, found in 25 Tex. Admin. Code, are: (1) § 139.51(1), requiring a physician licensed as an abortion provider to "ensure that all patients . . . are cared for in a manner and in an environment that enhances each patient's dignity and respect in full recognition of her individuality"; (2) § 139.51(2), requiring physicians to ensure that each patient will "receive care in a manner that maintains and enhances her self-esteem and self-worth"; and (3) § 139.2(43), which defines the standard of "quality" care as "[t]he degree to which care meets or exceeds the expectations set by the patient."

The court credited testimony from a defense witness who helped draft the provision that there is no objective way to measure whether a physician has "enhanced" a patient's dignity and self-esteem, and also that, as abortion is almost always a negative experience for the patient, it is unrealistic to hold physicians to those requirements under threat of civil and criminal penalties. In addition, the court found the definition of "quality" to be vague because it is couched in terms of the "expectations set by the patient," meaning the required standard of care would differ from patient to patient. The court found all three challenged sections of the regulations unconstitutionally vague, and concluded that the plaintiffs had established a substantial likelihood of success on their vagueness challenges to the provisions of the

------

were challenged by plaintiffs because they would first become applicable to them under the 1999 amendments to the licensing statute.

regulations in question, infringing the plaintiffs' rights to due process.

Finally, the court found that the threat of irreparable injury to the plaintiffs was substantial, that it outweighed any harm that the defendants might experience from a preliminary injunction, and that an injunction would not disserve the public interest. The defendants timely appealed the district court's interlocutory ruling pursuant to 28 U.S.C. § 1292(a)(1).

II.

ANALYSIS

A.   Standard of Review

A district court's grant of a preliminary injunction is reviewed for abuse of discretion.[14] Each of the four elements required to support a preliminary injunction, including substantial likelihood of success on the merits, presents a mixed question of fact and law. Findings of fact are reviewed only for clear error; legal conclusions are subject to de novo review.[15] Although the ultimate decision whether to grant or deny a preliminary injunction

---

[14] Hoover v. Morales, 164 F.3d 221, 224 (5th Cir. 1998); Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1051 (5th Cir. 1997); Sunbeam Prods., Inc. v. West Bend Co., 123 F.3d 246, 250 (5th Cir. 1997).

[15] Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999); Hoover v. Morales, 164 F.3d at 224. The four elements of a preliminary injunction are (1) substantial likelihood of success on the merits; (2) substantial threat that plaintiff will suffer irreparable injury; (3) injury outweighs any harm the injunction might cause the defendant; and (4) injunction is in the public interest. Hoover, 164 F.3d at 224.

13

is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed <u>de novo</u>.[16]  The standard of review is no different for our consideration of the district court's determination that three regulations are unconstitutionally vague.[17]

B.    <u>The 300-Abortion Threshold</u>

The record contains no evidence of anti-abortion animus, and no evidence that the 1999 amendments were passed in an attempt to limit abortion access or for any other improper purpose.[18]  Therefore, the district court correctly chose to evaluate the 1999 amendments as health and safety regulations subject to rational basis review.[19]  On <u>de novo</u> review, however, we disagree with the district court's conclusion that the plaintiffs are likely to succeed on the merits of their equal protection claim.

All that is required to survive rational basis review is a showing that the classification under examination conceivably could be related to a legitimate governmental purpose.  The court found

---

[16]  <u>Hoover</u>, 164 F.3d at 224.

[17]  <u>Campbell v. St. Tammany's Sch. Bd.</u>, 206 F.3d 482, 484 (5th Cir. 2000), <u>reh'g denied</u>, 231 F.3d 937 (5th Cir. 2000), <u>petition for cert. filed</u>, 69 U.S.L.W. 3514 (U.S. Jan. 24, 2001) (No. 00-1194); <u>United States v. Monroe</u>, 178 F.3d 304, 308 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1010 (1999).

[18]  Plaintiffs-Appellees do not appeal the district court's finding that the 1999 amendments place no undue burden on Texas women seeking an abortion.

[19]  <u>See, e.g.</u>, <u>Romer</u>, 517 U.S. at 632-33; <u>City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 446 (1985); <u>Dep't of Agric. v. Moreno</u>, 413 U.S. 528, 533 (1973).

— correctly, we believe — that the 1999 amendments have the legitimate state purpose of protecting the health of Texas women. The court's inquiry, therefore, is properly limited to whether a classification based on the number of abortions performed at a facility rationally serves that general purpose. Here, the answer clearly is "yes." Because without violating the Constitution, the State could have required all abortion providers to be licensed, it rationally could set an annual 300-abortion "floor" as an accommodation to private physicians who provide a number of abortions that the government considers to be too few to require licensing. Whether the court agrees with the accuracy of the line of demarcation drawn by the Legislature to distinguish the classification is of no great moment.[20]

Our holding today is consonant with the Fourth Circuit's recent decision in Greenville Women's Clinic v. Bryant, a case closely analogous to this one.[21] Greenville concerns South Carolina's 1995 amendment of its abortion clinic licensing statute.

---

[20] See Gregory v. Ashcroft, 501 U.S. 452, 473 (1991) (noting that a law setting 70 as the retirement age for state judges "is founded on a generalization. It is far from true that all judges suffer significant deterioration in performance at age 70. It is probably not true that most do. It may not be true at all. But a State does not violate the Equal Protection clause merely because the classifications made by its laws are imperfect.") (internal quotation omitted); see also City of New Orleans v. Dukes, 427 U.S. 297, 298 (1976) (upholding ordinance banning all pushcart vendors from the Vieux Carre, but exempting those who had operated for eight or more years).

[21] 222 F.3d 157 (4th Cir. 2000), cert. denied, 2001 WL 178202, 69 U.S.L.W. 3382 (U.S. Feb. 26, 2001) (No. 00-798).

15

That statute, which previously applied only to clinics in which second-trimester abortions are performed, was expanded by this amendment to cover every facility in which five or more first-trimester abortions are performed in one month.[22] The district court issued a preliminary injunction and, after a bench trial, held in part that the South Carolina amendment violated the equal protection rights of the plaintiff physicians. The Fourth Circuit reversed, writing:

> When it is recognized that the State interest is in regulating those facilities that are in the business of providing abortions, drawing the line at those performing five abortions per month is rational. While anyone could say that it is just as rational to draw the line at ten abortions per month or three abortions per month, this type of line-drawing is typically a legislative function and is presumed valid. Indeed, line-drawing of this type is not only typical of legislation, it is necessary.[23]

The Greenville court gave examples of several types of legislation that draw similar lines, including the application of the Americans With Disabilities Act to companies with 15 or more employees but not to those with 14 or fewer employees; and a state's grant of drivers' licenses to persons age sixteen or older but not to those under sixteen.[24] The Fourth Circuit concluded:

> In this case, South Carolina elected to regulate the business of providing abortions and determined that five per month would distinguish the abortion clinic from the

---

[22]  Id. at 159-60.

[23]  Id. at 174 (citing Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 314 (1976) (upholding mandatory police retirement age of 50)).

[24]  Id.

16

facility performing abortions incidental to another medical practice. The selection of this number is reasonably related to the State's legitimate interest in promoting and protecting the health of women visiting abortion clinics, <u>and therefore the actual placement of the line is not a decision that the courts may second-guess</u>.[25]

In the instant case, the district court mistakenly focused on whether the office of a physician who provides more than 300 abortions per year resembles the "high-volume" abortion clinics previously subject to licensure.[26] The appropriate question is not confined to whether the limit meets the legislative purpose of regulating high-volume, risky, or overburdened abortion facilities; rather, the 1999 amendments are constitutional if they serve <u>any</u> appropriate state goal. The amendments require Texas physicians who perform abortions in their offices to comply with licensing standards that cover issues such as staffing, infection control, and inspection by state officials. Such issues do bear a rational relationship to the legitimate state interest of protecting patient health and welfare. Through its Legislature, the State acted within its power in choosing to exempt physicians whom it deems to perform such a limited number of abortions as posing a lesser hazard to health. The determination made here by state officials

---

[25]   <u>Id.</u> at 175 (emphasis added).

[26]   The court wrote:  "[I]t is not rational to assume that a physician providing 300 abortions per year will expose his patients to 'high volume' risks similar to those of a typical abortion clinic. . . . This 'one a day' rationale cannot be reconciled with the state's argument that some physicians may be providing so many abortions that they are unable to adequately take care of patients."

17

cannot be said to be "based on reasons totally unrelated to the pursuit of [their] goal."[27]

In Romer v. Evans, the Supreme Court held that the search for the link between a classification and its objective "marks the limits of our own authority. In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous."[28] The link that we identify today is the one between the classification (doctors who annually perform a number of abortions that lawmakers consider to be sufficiently high to justify regulating) and the objective (protecting the safety of abortion patients). In the absence of the heightened bar of a fundamental right or suspect class, or any evidence of animus, the district court exceeded its authority by reviewing the propriety of the cut-off number selected by the Legislature. Deciding the optimal number of abortions to trigger the licensing requirement is a legislative function, and any redress for an improvidently chosen number must come through the democratic process, not the courts. The district court erroneously concluded as a matter of law that the 1999 amendments are substantially likely to fail rationality review, and thus abused its discretion by granting a preliminary

---

[27] McDonald v. Bd. of Election Comm'rs of Chi., 394 U.S. 802, 809 (1969).

[28] Romer, 517 U.S. at 632.

18

injunction grounded in the subject numerical classification.

C.   Vagueness

The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application."[29] A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement.[30]  We have held that "[a] state's legislative enactment is void for vagueness under the due process clause of the fourteenth amendment if it 'is inherently standardless, enforceable only on the exercise of an unlimited, and hence arbitrary, discretion vested in the state.'"[31]

Again, the provisions of three regulations found in 25 Tex. Admin. Code that the district court held to be unconstitutionally vague are: (1) § 139.51(1), requiring a physician licensed as an abortion provider to "ensure that all patients . . . are cared for in a manner and in an environment that enhances each patient's dignity and respect in full recognition of her individuality"; (2) § 139.51(2), requiring physicians to ensure that each patient

---

[29]  Smith v. Goquen, 415 U.S. 566, 572 n.8 (1974) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

[30]  Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).

[31]  Margaret S. v. Edwards, 794 F.2d 994, 999 (5th Cir. 1986) (quoting Ferguson v. Estelle, 718 F.2d 730, 735 (5th Cir. 1983)).

will "receive care in a manner that maintains and enhances her self-esteem and self-worth"; and (3) § 139.2(43), which defines the standard of "quality" care as "[t]he degree to which care meets or exceeds the expectations set by the patient." None of these provisions carries a criminal penalty for its violation alone, although operating an abortion facility without a license is a Class A misdemeanor.[32] The regulations do, however, carry potentially significant civil and administrative penalties, including fines and license revocation, which can be characterized as quasi-criminal. A quasi-criminal statute must define its terms "'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"[33]

We agree with the district court that each of these three regulations is unconstitutionally vague on its face because it impermissibly subjects physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others. Each of these three provisions measures compliance by the subjective expectations or requirements of an individual patient as to the enhancement of her dignity or self-esteem. Even a state's witness who had helped draft the provisions conceded that there are

---

[32] See 25 T.A.C. § 139.33(c); Tex. Health & Safety Code § 245.014.

[33] United States v. Clinical Leasing Serv., Inc., 925 F.2d 120, 122 (5th Cir. 1991) (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)).

20

no objective criteria for assessing compliance with the "enhancement" provisions, undermining the efficacy of the administrative process from which licensees may seek clarification. These provisions fail to "afford[ ] fair warning of what is proscribed."[34]

It is no solace that, as the defendants note, no abortion facility has yet been subjected to civil or criminal penalties for violating these regulatory provisions. Especially in the context of abortion, a constitutionally protected right that has been a traditional target of hostility, standardless laws and regulations such as these open the door to potentially arbitrary and discriminatory enforcement.[35] We hold that these regulations cannot be validly used in their intended applications, and that therefore the plaintiffs have established a substantial likelihood of success on their vagueness challenge to the subject provisions.[36] We also affirm the district court's conclusion that the plaintiffs have satisfied the other three preliminary injunction requirements as to

---

[34] Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 503 (1982).

[35] See Colautti v. Franklin, 439 U.S. 379, 391 (1979).

[36] See Hill v. Colorado, 530 U.S. 703, 120 S. Ct. 2480, 2498 (2000) (noting that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications'") (quoting United States v. Raines, 362 U.S. 17, 23 (1960)).

these regulations.[37]

### III.

### CONCLUSION

We acknowledge the concern expressed by the physicians who are the plaintiffs in this case, particularly Dr. Hansen, that their abortion patients have the opportunity to obtain personal care in a confidential setting, and without paying for unnecessary administrative costs. Nevertheless, our role in evaluating the plaintiffs' substantial likelihood of success on their equal protection claim is limited to reviewing whether the annual 300-abortion threshold set by the state for subjecting abortion facilities to licensing bears some rational relationship to the state interest in protecting the health and welfare of Texas abortion patients. We conclude that it does. Any scrutiny beyond that is necessarily left to the Legislature, not the courts. Consequently, we must vacate the preliminary injunction prohibiting enforcement of the Texas abortion licensing statute, Tex. Health & Safety Code §§ 245.001-245.023 as amended in 1999.

We agree with the district court, however, that the plaintiffs have shown a substantial likelihood of success on their vagueness challenge to three contested provisions of the licensing regulations. We therefore affirm the preliminary injunction granted by the district court with regard to those regulations,

---

[37] We further note that the defendants do not challenge the severability of the three enjoined provisions. See, e.g., Leavitt v. Jane L., 518 U.S. 137, 139 (1996).

22

ordering that Texas Commissioner of Health William R. Archer III and Texas Attorney General John Cornyn, in their official capacities, are enjoined from enforcing 25 Tex. Admin. Code §§ 139.2(43), 139.51(1), and 139.51(2) pending a full trial on the merits of this case.

AFFIRMED in part; REVERSED in part; and REMANDED to the district court for continued proceedings consistent with this opinion.