W. EUGENE DAVIS, Circuit Judge:
This case concerns the operation of Love Field, an airport owned by Plaintiff-Appel-lee the City of Dallas (the “City”), and leased in part to Defendant-Appellant Southwest Airlines Company (“Southwest”). The City filed a declaratory judgment action seeking a determination of whether it must order Southwest to accommodate Defendant-Appellee Delta Air Lines, Incorporated (“Delta”), at Love Field under the Lease Agreement or otherwise.
Delta, Southwest, and the City filed competing motions for preliminary injunctions. Delta argued that (a) the Lease Agreement requires the City to order Southwest to accommodate Delta, and (b) Delta may sue to enforce the obligations because it is a third party beneficiary under the Lease Agreement. The court granted Delta’s motion in full. It found *281 that the City was also entitled to-a preliminary injunction, in the alternative, for the same relief requested by Delta because the district court interpreted the Lease Agreement to require the City to accommodate Delta. Because it interpreted the Lease Agreement to require accommodation, the court necessarily denied Southwest’s motion.
Southwest appealed, arguing that Delta is not a third party beneficiary and that the Lease Agreement does not require the accommodation Delta seeks. The City did not appeal, but in its appellee brief it argued that although Delta should be accommodated under the Lease Agreement, Delta is not entitled to sue as a third party creditor beneficiary. For the reasons set forth below, we affirm the district court’s order granting the City’s preliminary injunction,[1] granting Delta an accommodation until a final determination on the merits, and affirm the district court’s denial of Southwest’s preliminary injunction. Because Delta will effectively receive the relief it seeks under the City’s preliminary injunction, we decline to address at this stage whether Delta is a third party creditor beneficiary.
I.Legal Context and Procedural History
' Love Field is an airport owned by Plaintiff-Appellee the City of Dallas and is most closely associated with Southwest, which is by far its biggest user.[2] Love Field has always been subject to special legislation (beginning with the 1979 Wright Amendment) which historically permitted it to operate only in a very limited geographic region, in essence to protect the business of the Dallas-Ft. Worth International Airport (“DFW Airport”), which does not have those geographic restrictions.
In 2006, Congress suggested that the Cities of Dallas and Fort Worth reach a long-term compromise removing the Love Field flight restrictions. The City of Dallas, the City of Fort Worth, the DFW Airport Board, and the two airlines then operating at Love Field, Southwest and Defendant American Airlines, entered into the so-called Five Party Agreement on July 11, 2006. The district court summarized the agreement as follows:
Important terms of the Five Party Agreement include the following:
1. A reduction in the total number of gates at Love Field from 32 to 20.
2. A prohibition of the subdivision of a gate in any form, including the use of hardstands which permit an airline to “ground load/unload” their passengers.
3. The allocation of 16 “preferential use” gates to Southwest, two “prefer *282 ential use” gates to American, and two “preferential use” gates to ExpressJet Airlines, Inc.
4. A limitation on flight operations to the hours of 6:00 a.m. to 11:00 p.m.
5. A prohibition of international flights originating from Love Field.
In addition to these terms, the Five Party Agreement refers to the possibility of a new entrant airline seeking space to operate at Love Field under the new gate limitations:
To the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service. If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas’ existing lease agreements.[3]
Relevant to this dispute, Love Field allows a maximum of 10 flights per day per gate, for a maximum of 200 flights per day.
The district court found that the Five Party Agreement does not define the term “preferential use,” but the individual Lease Agreements between the City and each airline (referred to in each Lease Agreement as a “Signatory Airline”) defines “preferential use” to mean that the Signatory Airline is the “primary, but not the sole, user.” [4]
After the Five Party Agreement was formalized, the parties presented their agreement to Congress as the collaborative local effort for reforming and/or repealing the Wright Amendment. Several, though not all, provisions of the Five Party Agreement were ultimately incorporated into the Wright Amendment Reform Act (“WARA”), which officially repealed the Wright Amendment when it was adopted on October 13, 2006; but maintained the long-distance flight restrictions from Love Field for eight more years until October 2014. Just as in the Five Party Agreement, WARA addressed new entrant airlines needing space to operate at the now gate restricted Love Field, specifically providing that, “[t]o accommodate new entrant air carriers, the city of Dallas shall hon- or the scarce resource provision of the existing Love Field leases.” (Emphasis added.) The substantive provisions regulating flights in and out of Love Field were incorporated into WARA. The provisions of the Five Party Agreement which were not incorporated into and adopted by WARA are simply contractual obligations between the five parties that are independent of WARA, and do not include Delta.[5]
In addition, Article 1.12 of the Five Party Agreement requires the parties to amend the underlying Lease Agreements and “take such actions, as necessary or appropriate, to implement” the Five Party Agreement. Article 11.11 (titled “NO THIRD PARTY BENEFICIARIES”) states that the Five Party Agreement is intended only for the benefit of the parties thereto and is not intended to create any third party beneficiary relationship with anyone.
Thus, the Five Party Agreement facially requires the City and Southwest to accommodate a “new entrant air carrier,” but it *283 expressly disavows the creation of any third party beneficiary status and leaves the implementation of those obligations to the amendment of the Lease Agreement between Southwest and the City. That Lease Agreement, as amended, sits at the core of this dispute. The district court summarized the relevant terms as follows:
The terms of each Lease Agreement for gates between the City and the respective Signatory Airline are essentially identical, according to the City. The Signatory Airline has either exclusive use or preferential use of its leased space at Love Field, as described in the Lease Agreements. “Exclusive use” pertains to that leased space that the Signatory Airline has the sole right to use. “Preferential use”, on the other hand, applies to those leased spaces where the Signatory Airline is considered the primary, but not sole, user. Under each Lease Agreement, no Signatory Airline has exclusive use of any gate, only preferential use. There is exclusive use leased space at Love Field; but, there are no exclusive use gates at Love Field.
Just as both the Five Party Agreement and WARA recognized the limitations created by the gate restrictions, each Lease Agreement addresses the possibility of Love Field facilities becoming a “scarce resource”. The Lease Agreement anticipates a new entrant air carrier (“Requesting Airline”) may seek to provide service at Love Field with the new gate restrictions. Recognizing the need for “open access and uniform treatment”, the Lease Agreement goes further and provides a procedure in Section 4.06F when accommodation is sought by a Requesting Airline. This procedure requires the Requesting Airline first exhaust all reasonable efforts to secure a voluntary arrangement for accommodations from each Signatory Airline. If the Requesting Airline’s attempt for voluntary accommodation fails, then the City’s Director of Aviation (“Director”) will notify each Signatory Airline that if a voluntary accommodation is not made within the 30-day time frame under each Lease Agreement, the Director will select one of the Signatory Airlines to fulfill the accommodation request. Notice will then be sent to the selected Signatory Airline which will have 10 days to comment on or dispute the Director’s choice. The Signatory Airline must accommodate the Requesting Airline unless the Director rescinds his selection. The accommodation procedure does not specify options or remedies the Requesting Airline might have if the Director rescinds his selection.[6]
Finally, Section 14.33 of the Lease Agreement contains an “entire agreement” clause, providing that the Lease Agreement itself “constitutes the entire agreement” which may not be changed without a written instrument.
As the district court noted, some post-WARA developments at Love Field resulted in Southwest having a lease for preferential use of 16 gates, Defendant United Airlines, Inc. having a lease (as successor to ExpressJet Airlines, Inc.) for preferential use of two gates, and Defendant Virgin America, Inc. having a preferential use of two gates as a result of the merger of American with U.S. Airways. The Department of Justice previously held that Virgin’s gates cannot go to either Southwest or Delta.
We now turn to the actual dispute: Delta was not a Signatory Airline because it did not have a Lease Agreement with the *284 City.[7] It entered into a month-to-month sublease with American beginning in July 2009, but that lease was set to end on October 12, 2014. As contemplated by the Lease Agreement, Delta, as a Requesting Airline, sought to remain at Love Field through a voluntary accommodation, which it requested from the Signatory Airlines on June 13, 2014.
Delta was unable to obtain a voluntary accommodation, so it requested a mandatory accommodation from the City in a letter dated July 16, 2014. The City selected United to accommodate Delta because United was only using seven flights daily out of its two leased gates, which left-13 flights per day still available under Love Field’s 10 flights per gate policy. In the meantime, Southwest first acquired use of United’s gates through a gate usage agreement with United and later bought the gates for $120 million in late 2014, leaving Southwest with 18 gates and Virgin with two. Based on Southwest’s purchase of United’s gates, the City rescinded its accommodation decision and notified Delta orí September 29, 2014 that it could no longer be accommodated.
The Lease Agreement provides no remedy for a Requesting Airline in the event the City rescinds its accommodation selection, but Delta again requested accommodation. The City initiated a second accommodation request on December 1, 2014, and sent a letter to Virgin, United, and Southwest, stating that Delta’s request had triggered the accommodation process set out in Section 4.06F of the Lease Agreement and that the City would choose an airline to accommodate Delta if they could not choose among themselves. The airlines failed to voluntarily accommodate Delta, and the City never made a mandatory accommodation decision.
The City twice asked the Department of Transportation (“DOT”) for advice on how to handle the situation. The DOT opined that the City had a legal obligation to accommodate Delta, but the DOT’s opinions do not appear to constitute a final agency action. The City never made a decision on its own, and none of the airlines agreed to voluntarily accommodate Delta.[8]
Delta continued to operate five flights per day out of Love Field under its temporary gate usage agreement with United which was set to expire after 180 days, on July 6, 2015. When Southwest acquired United’s gates, it offered to honor United’s temporary agreement with Delta for five daily flights until July 6. Southwest refused to extend that date.
Continuing to press the accommodation request with the City, Delta told the City it would refuse to cease operations at Love Field on July 7, 2015, because it had a right to accommodation. In an attempt to avoid what it says would be potential chaos at Love Field beginning July 7, 2015, the City filed this lawsuit on June 17, 2015, seeking declaratory relief related to, among other things, its legal obligations and rights with respect to the Five Party Agreement, WARA, the Lease Agreements and federal regulations and laws affecting Love Field; essentially the City is asking this Court to “Please tell us what to do.”[9]
The district court convinced the parties to enter into a temporary agreement preserving the status quo at Love Field until it could address the dispute. Under this temporary agreement, Southwest contin-- *285 ued allowing Delta to operate five daily flights out of Love Field.[10]
The parties then filed competing motions for preliminary injunctions. Delta sought injunctive relief against Southwest to preserve the status quo (i.e., five daily flights) pending final resolution of the declaratory judgment action. Southwest sought injunctive relief against Delta prohibiting Delta from trespassing on Southwest’s gates at Love Field once the temporary gate usage agreement terminated, on the ground that Southwest is not required to accommodate Delta under the Lease Agreement. The City requested, in the alternative, that the district court grant the relief requested by either Delta, the relief requested by Southwest, or any other appropriate relief.
The district court correctly set out the framework for determining whether to grant a preliminary injunction as follows:
The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has clearly carried the burden of persuasion’ on all four requirements. Failure to sufficiently establish any one of the four factors requires this Court to deny the movant’s request for a preliminary injunction. Any factual findings and/or conclusions of law the Court makes herein are not binding at a trial on the merits.[11]
The district court granted a preliminary injunction in favor of Delta and against Southwest because it found that, in addition to demonstrating the other three requirements for a preliminary injunction, Delta had also shown a substantial likelihood of success on the merits regarding (a) its ability to sue as a third party creditor beneficiary under the Lease Agreement and (b) its claim that the Lease Agreement required Delta to be accommodated. The district court also found that the City, as a party to the Lease Agreement, was independently entitled to its alternative request for injunctive relief requiring Delta to be accommodated under the court’s interpretation of the contract. Based on its interpretation of the Lease Agreement, the court necessarily concluded that Southwest failed to show a substantial likelihood of success on the merits.
Accordingly, the district court denied Southwest’s motion and entered a preliminary injunction in favor of Delta essentially permitting Delta to continue operating five flights daily until a final decision on the merits. Southwest timely appealed.
II. Jurisdiction and Standard of Review
The district court had subject matter jurisdiction under 28 U.S.C. § 1381,'1332, and 1367. We have jurisdiction over this timely appeal of the district court’s denial of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).
*286 We review the district court’s ultimate decision to grant or deny a preliminary injunction for abuse of discretion, but we review “a decision grounded in erroneous legal principles” de novo.[12]
III. Analysis
On appeal, Southwest argues that it is entitled to a preliminary injunction because the Lease Agreement does not require accommodation. It also argues that, at any rate, Delta may not sue because it is not a third party beneficiary under the Lease Agreement. Delta defends the district court’s opinion in full. The City argues that the district court’s interpretation of the Lease Agreement requiring accommodation is correct, but Delta is not a third party beneficiary under the Lease Agreement and should not be able to sue as a non-party.
The parties argue a great deal over the question of whether Delta, a non-party to the Lease Agreement, is a third party creditor beneficiary entitled to sue on its own right, but we conclude that we need not resolve this question at the preliminary injunction stage. That is because the parties to the Lease Agreement, Delta and the City (at least in the alternative), have sought preliminary injunctions based on competing interpretations of the contract. The interpretations are mutually exclusive, as is the relief available. Either the Lease Agreement requires accommodation or it does not. Either Delta must be accommodated in the meantime at the status quo of five daily flights out of Love Field or it must not be.
If the interpretation requiring accommodation prevails, Delta will continue to enjoy a temporary accommodation under the City’s preliminary injunction, regardless of whether Delta is a third party beneficiary entitled to sue in its own right. On the other hand, if Southwest’s interpretation is correct and the Lease Agreement does not require accommodation, then Delta’s status as third party beneficiary could not help it. Accordingly, we decline to reach the third party beneficiary status question and instead address only the question of whether the Lease Agreement requires accommodation.
Southwest does not challenge the district court’s findings on three of the four preliminary injunction requirements as to either Delta or the City. Southwest challenges only the first requirement, whether Delta and the City demonstrated a substantial likelihood of success on the merits. The district court summarized the standard as follows:
In establishing a “substantial likelihood of success”, the movant “is not required to prove [his] entitlement to summary judgment” for purposes of preliminary injunction. Byrum v. Landreth, 566 F.3d 442, 446 (5th Cir. 2009); see also Janvey v. Alguire, 647 F.3d 585, 595-96 (5th Cir. 2011). The district court “look[s] to ‘standards provided by the substantive law’ ” to determine likelihood of success on the merits. Janvey, 647 F.3d at 596 (quoting Roho, Inc. v. Marquis, 902 F.2d 356, 358 (5th Cir. 1990)).[13]
Delta asserted four different claims, but the district court only addressed its claims against Southwest for breach of contract and declaratory judgment based on the Lease Agreement.[14] *287 Under Texas law, a party asserting breach of contract
must prove: (1) the existence of a valid contract; (2) that the [party] performed or tendered performance; (3) that the other party breached the contract; and (4) that the party was damaged as a result of the breach. Cordero v. Avon Products., Inc., No. 15-40568 [629 Fed. Appx. 620, 622-24], 2015 WL 6530721, at *2 (5th Cir. Oct. 29, 2015). A party must establish its privity to the contract or its status as a third-party beneficiary in order to sue for breach of contract. Maddox v. Vantage Energy, LLC, 361 S.W.3d 752, 756-57 (Tex.App. — Ft. Worth 2012).[15]
The City’s own motion for a preliminary injunction is a bit broader than a breach of contract claim, in that the City seeks not just a narrow determination of whether Southwest breached the Lease Agreement but a general determination of its own rights and obligations under the Lease Agreement, the Five Party Agreement, the WARA, and other applicable rules.[16] In essence, the City simply wants to know what it is required to do. Though there are theoretical differences between Delta’s arguments and the City’s, there are no practical differences at this stage. The interpretation of the Lease Agreement resolves the preliminary injunction inquiry.
On the merits of Delta’s claim that Southwest breached the Lease Agreement by failing to accommodate it as required under Section 4.06F, the court noted that Texas law requires Delta to prove: “(1) the existence of a valid contract; (2) that Delta performed or tendered performance; (3) that Southwest breached the contract; and (4) that Delta was damaged as a result of the breach.”[17] The court noted that the contract was valid, arid it held that the second factor was met because
the record establishes that Delta performed its obligation under the accommodation procedure in section 4.06F by contacting all Signatory Airlines and any airline subleasing gate space from a Signatory Airline beginning June 13, 2014, to try to secure voluntary accommodation.[18]
The court also held that Delta suffered harm from the alleged breach because it would no longer be able to operate at Love Field at all if Southwest refused to honor its accommodation obligations under the Lease Agreement.[19] The biggest question, of course, is whether Southwest breached the Lease Agreement at all.
The court focused on the fact that Section 4.06F provides that the Signatory Airline (here Southwest) “agrees to accommodate such Requesting Airline at its Lease Premises at such times that will not unduly interfere with its operating schedule” but does not define the phrase “unduly interfere with.”[20] The court started with the legislative history:
The Court finds it very interesting that former Mayor Laura Miller testified about this exact phrase in the Lease Agreement at the Congressional subcommittee hearing on reforming the Wright Amendment Act. In response to a subcommittee member’s question about the meaning of the undefined and “vague” term “unduly interfere with”, Ms. Miller testified:
*288 Well it was crafted by the Dallas City Attorney’s Office and we understand, since it has never been tested, we have never had a conflict; that we should, if we are responsible, create a very clear policy using this as the template for how we are in real terms going to be executing this. This [term] gives us the authority to tell [a Signatory Airline], you have to make room. But I think that like other airports like you cited that have this issue of capacity, we need to have a very clear policy in place so that the tenants have a clear expectation for how it’s going to work when the director say we shall make room for [a Requesting Airline] and this is how we are going to do it.
Ex. 631, p. 0052. As we now know, the City wholly failed to craft any policy, let alone a clear one, setting forth how the accommodation procedure and process would work in reality. This “vague language about .‘unduly interfere with’ ” was drafted by the City itself and was noted by at least one concerned subcommittee member of contributing to “Southwest [being] in the catbird seat”. And worse, then Mayor Laura Miller acknowledged the need for the City, “if we are responsible, [to] create a very clear policy ... for how we are in real terms going to be executing this.” Now in this case, the Court is asked to follow through with what the City should have done years ago.[21]
The district court viewed the problem before it as one of supplying a reasonable interpretation of vague or undefined contractual language, which in turn required examining the particular facts of Southwest’s usage and Southwest’s own past interpretation of that language. The court held that the question of whether an accommodation would “unduly interfere with” a Signatory Airline’s operations must be examined at the time the accommodation request is made:
The Court concludes, for purposes of this preliminary injunction, that “unduly interfere with” in section 4.06F means the requested flight accommodation can fit within the Signatory Airline’s existing published schedule, at the time the accommodation request is made, without causing the Signatory Airline’s existing schedule to reach maximum usage. The evidence establishes that Southwest considers maximum usage or “full utilization” of gates at Love Field to be 10 flights daily per gate. The Court finds Delta provided evidence that, at several points in time after its initial accommodation request in June 2014, Southwest was able to accommodate Delta’s five daily flights on Southwest’s 16 gates without unduly interfering with Southwest’s existing operating schedule.[22]
The district court set out, in detail, how Southwest had plenty of room in its schedule to accommodate Delta’s five flights daily when Delta made its first request in June 2014.[23] As the district court noted, Southwest did not even announce its intention to operate at full capacity (10 flights per gate per day) until February 26, 2015, and it did not reach full capacity until August 9, 2015.[24] Thus, the court concluded that Southwest could have voluntarily accommodated Delta’s five daily flights without “unduly interfering with” Southwest’s schedule at any point prior to August 9, *289 2015.[25] Beyond the obvious capacity to voluntarily accommodate, the district court pointed out that Southwest’s Lease Agreement was for preferential, not exclusive, use, and Southwest could not obtain exclusive use simply by maximizing its own utilization following an accommodation request:
Under the Lease Agreement, preferential use of airport facilities means the Signatory Airline is the primary, but not sole, user. Exclusive use means the airline has the sole right to use the space. There are no exclusive use gates at Love Field. Southwest has preferential use of the gates it leases from the City and subleases from United. Therefore, Southwest is considered to be the primary, but not sole, user of the gates. Southwest does not have an unfettered right to the gates it has leased; and, despite Southwest’s argument to the contrary, the preferential use rights are subject to the accommodation provision contained in the Lease Agreement, which Southwest agreed to and signed. Southwest’s position is that accommodation is not required as long as they are using the gates at full utilization of 10 flights daily out of each gate. Southwest did not “fully utilize” its gate space until, at the earliest, its announcement on February 26, 2015 of increased flight operations, or, at the latest, until August 2015 when the actual increase was fully realized. Southwest cannot “ramp up” its flight schedule to thwart the pending accommodation request by Delta.[26]
The district court noted that when the WARA was being debated before Congress, Southwest’s CEO at the time, Herb -Kelleher, had testified that “ ‘[A]ny carrier that is desirous now of serving Love Field can easily be accommodated even after those [12] gates come down,’ limiting Love Field to 20 gates.”[27] Mr. Kelleher testified that the City would simply tell Southwest, “you have got these vacant spaces in your gate utilization and by golly you are going to put another carrier in there.”[28] The district court summarized:
Southwest agreed in Section 4.06F that it would accommodate a “new entrant airline” when accommodation would not “unduly interfere” with its own operating schedule. As the Court has found, Southwest’s schedule would clearly accommodate Delta when it made its initial request for voluntary accommodation in accordance with Section 4.06F, and for several months after. Delta has established Southwest did not comply with its contractual obligation and, therefore, breached Section 4.06F, the accommodation provision, of the Lease Agreement.[29]
In sum, the court found that the Lease Agreement required Southwest to accommodate a new entrant airline such as Delta, and that Southwest had the capacity to accommodate Delta easily at the time Delta requested the accommodation, which is when the City should have granted the mandatory accommodation. Thus, the court concluded that Southwest could not escape its accommodation obligation merely by increasing its schedule to full utilization after the fact to shut Delta out. Rather, it was required to accommodate Delta’s five flights daily and maintain that accommodation indefinitely under the court’s in *290 terpretation of the “unduly interfere with” language of Section 4.06F.
We agree with the district court that Delta and the City have shown a substantial likelihood of success on the merits on the claim that the Lease Agreement requires Delta to be accommodated. The Lease Agreement plainly establishes a duty to accommodate by both Southwest and the City, and the scope of that duty is determined largely through the interpretation of language which the Lease Agreement itself leaves undefined. The district court, interpreting that language for the first time, found that Southwest owed the duty to accommodate Delta under these circumstances, effective when Delta should have received a mandatory accommodation. We find the district court’s reasoning to be persuasive under these facts.
We are not persuaded by Southwest’s arguments, which largely depend on a contrary interpretation of the Lease Agreement’s undefined language. For instance, Southwest argues that Delta’s usage would “unduly interfere with” Southwest’s operating schedule, especially after Southwest reached full utilization, but the district court explicitly, considered and rejected those arguments under its own interpretation of the contractual language, with which we agree at this stage.
Southwest raises no persuasive arguments against the district court’s interpretation. The crux of Southwest’s position is that its preferential use lease essentially entitles it to exclusive use of the gate once it reaches full utilization. One problem for Southwest is that the language of the Lease Agreement itself suggests that even an exclusive use lease might be subject to accommodation, in that the “scarce resource” clause in Section 4.06F refers to “exclusive or preferential use” in connection with the accommodation obligation.
Next, Southwest argues that Section 4.06F is not even triggered unless and until the City ordered Southwest to accommodate Delta, which never happened because the City failed to act. The problem is that the City filed this suit seeking a determination of its own obligations under the Lease Agreement, among other things, and the district court found that the City was required to accommodate Delta. The City sought appropriate injunctive relief, including an accommodation of Delta if that is required under the Lease Agreement. Under the district court’s interpretation of the Lease Agreement, which we adopt at this stage, accommodation is required.
In short, Southwest has not challenged three of the preliminary injunction factors,only whether the City (and Delta, by extension) has shown a substantial likelihood of success on the merits on its claim that the Lease Agreement requires Delta’s accommodation. The district court, examining the Lease Agreement carefully, concluded that the contract’s plain language and the court’s interpretation of undefined terms (especially the meaning of “unduly interfere with”) combined to show that the City had shown a substantial likelihood of success on the merits.
We find the district court’s interpretation reasonable, and we agree that the City has shown a substantial likelihood of success on the merits. Accordingly, we affirm the court’s grant of the City’s motion for a preliminary injunction, preserving the status quo and allowing Delta to continue to operate five daily flights out of Love Field. Because Delta will receive the relief it requests under the City’s preliminary injunction, we decline to reach the issue of Delta’s motion for a preliminary injunction, which would require a determination of Delta’s third party beneficiary status.
*291 Because we affirm the district court’s grant of the City’s motion for a preliminary injunction, we necessarily affirm the district court’s denial of Southwest’s motion for a preliminary injunction.
IV. Conclusion
As noted above, in the district court’s memorandum opinion and order, it twice stated that it was granting the City’s motion for a preliminary injunction but technically terminated the City’s motion as moot, because it was granting the same relief under Delta’s preliminary injunction. The effect of this opinion is to grant the City’s motion and give interim relief to Delta. For the reasons set out above, we VACATE the district court’s order terminating the City’s motion as moot and, consistent with the district court’s opinion, RENDER judgment granting the City’s motion for a preliminary injunction and ordering the accommodation of Delta until a judgment on the merits is reached. We also AFFIRM the district court’s denial of a preliminary injunction in favor of Southwest. Because Delta will receive an accommodation under the City’s preliminary injunction, we decline to address, as moot, the district court’s grant of Delta’s motion for a preliminary injunction.

. The district court twice stated in its opinion that it was granting the City’s motion for a preliminary injunction but instead terminated the motion as moot, because it was already granting the same relief under Delta’s preliminary injunction. See 2016 WL 98604 at *1 ("Because the equitable factors also weigh in favor of the City, the Court GRANTS the City’s motion.” (emphasis in original)) and *15 ("So, even if the Court did not to grant Delta’s motion, the Court grants the City’s motion for injunctive relief.” (emphasis in original)); compare id. at *16 ("The Clerk of the Court is hereby directed to terminate the City's motion for preliminary injunction as moot.” (emphasis in original)). The court’s intent to grant the City’s motion and enter a preliminary injunction directing it to accommodate Delta is clear, but affirming that portion of the court’s order requires this court to vacate the district court’s order terminating as moot the City’s motion for a preliminary injunction and to render judgment in favor of the City. .

. See generally City of Dallas v. Delta Airlines, Inc., No. 3:15-CV-2069-K, 2016 WL 98604, at *1-6 (N.D. Tex. Jan. 8, 2016). The facts in this section are taken from the district court’s opinion unless otherwise noted.

. Id. at *2.

. Id.) see also Amended and Restated Lease of Terminal Building Premises (Airport Use and Lease Agreement) by and between City of Dallas and Southwest Airlines Co. (hereinafter simply "Lease Agreement”) at Section 1.46 (defining "Preferential Use Space”).

.2016 WL 98604, at *2.

. 2016 WL 98604, at *3 (emphasis in original).

. For more information on the accommodation requests, see generally id. at *3-5.

. Id. at *6.

. Id.

. 2016 WL 98604, at *6.

. Id. at *6 (N.D. Tex. Jan. 8, 2016) (citations and internal quotation marks omitted).

.Speaks v. Kruse, 445 F.3d 396, 399 (5th Cir. 2006) (quoting Women’s Med. Ctr. of Nw. Houston v. Bell, 248 F.3d 411, 419 (5th Cir. 2001)); Janvey v. Alguire, 647 F.3d 585, 595 (5th Cir. 2011) (citing Byrum v. Landreth, 566 F.3d 442, 445 (5th Cir. 2009)).

. 2016 WL 98604, at *7.

. Id.

. Id.

. Id. at *14.

. Id. at *9 (citation omitted).

. Id.

. Id. at *12.

. Id. at *10.

. 2016 WL 98604 at *10 (emphasis in original).

. Id.

. Id.

. Id.

. Id. at *11.

. Id.

. 2016 WL 98604 at *11 (quoting congressional testimony)

. Id.

. Id.