**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 17, 2012

No. 11-30296

Lyle W. Cayce
Clerk

CHOICE INCORPORATED OF TEXAS, doing business as Causeway Medical
Clinic; BOSSIER CITY MEDICAL SUITE, INCORPORATED; DELTA
CLINIC OF BATON ROUGE, INCORPORATED; MIDTOWN MEDICAL,
L.L.C.; WOMEN'S HEALTH CARE CENTER, INCORPORATED; JOHN
DOE, M.D.,

Plaintiffs–Appellants,

v.

BRUCE D. GREENSTEIN, in his official capacity as Secretary of the
Louisiana Department of Health and Hospitals,

Defendant–Appellee.

Appeal from the United States District Court
for the Middle District of Louisiana

Before DENNIS, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Plaintiffs sued the Secretary of the Louisiana Department of Health and
Hospitals (the Secretary or the Department), challenging the constitutionality
of Louisiana's Act 490. Prior to hearing the merits, the district court granted the
Secretary's motion to dismiss, holding that the claims were not ripe. We affirm
the district court's decision to dismiss the claims because Plaintiffs have failed
to show that hardship will result from withholding court consideration at this
time.

No. 11-30296

**I**

**A**

Act 490, enacted in 2010, amended Louisiana's Outpatient Abortion Facility Licensing Law of 2001. Specifically, Act 490 amended Section 40:2175.6 by removing a provision that provided that the procedure for denial, suspension, or revocation of an outpatient abortion facility (OAF) license would be the same as that for hospitals.[1] The revised section provides:

> The [S]ecretary of the [D]epartment may deny a license, may refuse to renew a license, or may revoke an existing license, if an investigation or survey determines that the applicant or licensee is in violation of any provision of this Part, in violation of the licensing rules promulgated by the [D]epartment, or in violation of any other federal or state law or regulation.[2]

Previously, the Secretary could deny, suspend, or revoke a license only after finding a "substantial failure . . . to comply," but Act 490 only requires a determination that there has been a "violation" for the Secretary to deny, refuse to renew, or revoke a license.[3] Act 490 also grants the Secretary new authority to deny, refuse to renew, or revoke a license if the applicant or licensee violates "any other federal or state law or regulation."[4] While the right to file a suspensive appeal (suspending the execution of the judgment) with the office of the Secretary is retained, Act 490 does not include the prior provision that granted a right to appeal suspensively to a district court for trial de novo.[5] Act

---

[1] 2010 La. Acts 490 (codified at LA. REV. STAT. ANN. § 40:2175.6 (Supp. 2012)).

[2] LA. REV. STAT. ANN. § 40:2175.6(G) (Supp. 2012).

[3] *Compare* LA. REV. STAT. ANN. § 40:2175.6(G) (2008), *and id.* § 40:2110(A), *with* LA. REV. STAT. ANN. § 40:2175.6(G) (Supp. 2012).

[4] *Compare* LA. REV. STAT. ANN. § 40:2175.6(G) (2008), *and id.* § 40:2110(A), *with* LA. REV. STAT. ANN. § 40:2175.6(G) (Supp. 2012).

[5] *Compare* LA. REV. STAT. ANN. § 40:2175.6(G) (2008), *and id.* § 40:2110(B)-(C), *with* LA. REV. STAT. ANN. § 40:2175.6(G) (Supp. 2012).

No. 11-30296

490 still requires the Secretary to provide thirty days written notice before denying, refusing to renew, or revoking a license.[6]

Act 490 also authorizes the Secretary to issue an immediate suspension in some circumstances:

> [T]he [S]ecretary . . . may issue an immediate suspension of a license if an investigation or survey determines that the applicant or licensee is in violation of any provision of this Part, in violation of the rules promulgated by the [D]epartment, or in violation of any other federal or state law or regulation, *and the [S]ecretary determines that the violation or violations pose an imminent or immediate threat to the health, welfare, or safety of a client or patient.*[7]

The Secretary must give written notice of an immediate suspension, and the suspension becomes effective upon receipt of such notice.[8] If the Secretary issues an immediate suspension, the licensee has the right to file a devolutive appeal (not suspending execution of the judgment), or the licensee can seek injunctive relief in district court.[9] To obtain injunctive relief, the licensee must prove "by clear and convincing evidence that the [S]ecretary's decision . . . was arbitrary and capricious."[10] No longer is there any requirement that the licensee be "given an opportunity to show compliance with all lawful requirements for the retention of the license."[11]

Finally, Act 490 added a new provision, which provides:

---

[6] *Compare* LA. REV. STAT. ANN. § 40:2175.6(G) (2008), *and id.* § 40:2110(A), *with* LA. REV. STAT. ANN. § 40:2175.6(G)(1) (Supp. 2012).

[7] LA. REV. STAT. ANN. § 40:2175.6(H) (Supp. 2012) (emphasis added).

[8] *Id.* § 40:2175.6(H).

[9] *Id.* § 40:2175.6(H)(1)-(2).

[10] *Id.* § 40:2175.6(H)(2).

[11] *Compare* LA. REV. STAT. ANN. § 49:961(C) (2003), *with* LA. REV. STAT. ANN. § 40:2175.6(H) (Supp. 2012).

No. 11-30296

If a license is revoked or renewal of a license is denied other than for cessation of business or non-operational status, or if the license is surrendered in lieu of an adverse action, any owner, officer, member, manager, director, or administrator of the licensee may be prohibited from owning, managing, directing, or operating another outpatient abortion clinic in the state of Louisiana.[12]

## B

The petitioners in this case are Choice Inc. of Texas; Bossier City Medical Suite, Inc; Delta Clinic of Baton Rouge, Inc.; Midtown Medical, L.L.C.; and Women's Health Care Center, Inc., five of the seven licensed OAFs in Louisiana, and John Doe, M.D., a physician who provides abortion services at some of those facilities. We will refer to these parties collectively as "Choice." Although Act 490 has not been enforced against Choice, it filed a pre-enforcement challenge to Act 490's constitutionality in federal district court, seeking a declaratory judgment and injunctive relief. Choice raised four constitutional challenges to Act 490: (1) it is unconstitutional under the Due Process Clause because it fails to give OAFs fair notice of the conditions of licensure and encourages arbitrary and discriminatory enforcement; (2) it violates the OAFs' rights under the Equal Protection Clause by treating them differently from all other medical facilities regulated by the Department without any basis for doing so; (3) it violates the OAFs' rights to due process because it deprives them of liberty and property interests in an arbitrary, unreasonable, and capricious manner and invests an impermissible degree of subjective discretion in the Secretary; and (4) it violates the fundamental right to terminate a pregnancy guaranteed by the Fourteenth Amendment by imposing a substantial obstacle in the path of patients seeking to obtain pre-viability abortions.

In challenging Act 490, Choice does not rely solely on the changes in statutory language previously described. Choice also notes that the other two

---

[12] LA. REV. STAT. ANN. § 40:2175.6(I) (Supp. 2012).

No. 11-30296

OAFs in Louisiana, Hope Medical Group for Women (Hope) and Gentilly Medical Clinic for Women (Gentilly), neither a party to this litigation, are currently subject to revocation proceedings. In particular, Choice relies on the enforcement action against Hope to challenge the Department's implementation of Act 490. The thrust of Choice's argument is that the Department's actions evince a new policy, pursuant to which the Department will no longer provide an OAF with notice of alleged deficiencies and an opportunity to correct them before suspending or revoking the OAF's license.

## C

Prior to hearing the merits of Choice's claims, the district court granted the Secretary's motion to dismiss. Considering the 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the district court held that the claims were not ripe, determining that Choice "[would] not suffer any significant hardship" and that "the issues [were] not fit for judicial decision at the present time." With respect to hardship, the district court determined that "nothing in Act 490 requires [Choice] to alter [its] conduct; instead, it alters the State's conduct in detecting and addressing violations." Additionally, the court noted that although Act 490 broadened the universe of laws the violation of which could result in an adverse licensure decision, Choice was "legally obligated to adhere to those statutes and regulations notwithstanding Act 490." With respect to fitness for judicial decision, the court concluded that Act 490 had yet to be enforced "in such a 'Draconian' fashion" as feared by Choice, and that "it is pure speculation to say that [Choice] may one day be subject to the provisions in Act 490 of which [it] complain[s]." Furthermore, the court viewed the Department's enforcement action against Hope as "too isolated" to assist in the evaluation of Choice's claims. Choice now appeals, arguing that the district court erred in its ripeness analysis.

## II

5

No. 11-30296

A district court's grant of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is reviewed de novo,[13] and more specifically, the jurisdictional issue of ripeness is a legal question for which review is de novo.[14] The plaintiff, as the party asserting jurisdiction, bears the burden of proof.[15] In assessing jurisdiction, the district court is to accept as true the allegations and facts set forth in the complaint.[16] Additionally, "the district court is empowered to consider matters of fact which may be in dispute."[17]

> The district court consequently has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.[18]

"[A] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."[19]

### III

### A

---

[13] *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011).

[14] *Lopez v. City of Houston*, 617 F.3d 336, 339 (5th Cir. 2010).

[15] *Life Partners*, 650 F.3d at 1029; *see also Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("[T]he plaintiff constantly bears the burden of proof that jurisdiction does in fact exist.").

[16] *Life Partners*, 650 F.3d at 1029 (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 553 (5th Cir. 2010)).

[17] *Ramming*, 281 F.3d at 161 (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

[18] *Williamson*, 645 F.2d at 413; *see also Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011).

[19] *Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

No. 11-30296

Article III of the United States Constitution provides that federal courts have the power to decide only actual cases or controversies.[20] The justiciability doctrines of standing, mootness, political question, and ripeness "all originate in Article III's 'case' or 'controversy' language . . . ."[21] The ripeness doctrine also is drawn "'from prudential reasons for refusing to exercise jurisdiction.'"[22] The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ."[23]

"A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical."[24] "The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"[25] "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."[26] However, "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness."[27] Thus, we must first determine if Choice has shown that hardship will result if court consideration is withheld at this time.

---

[20] U.S. CONST. art. III, § 2.

[21] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

[22] *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)).

[23] *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

[24] *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581-82 (1985); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588-89 (1972)).

[25] *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149).

[26] *New Orleans*, 833 F.2d at 587 (citing *Thomas*, 473 U.S. at 581-82).

[27] *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000).

No. 11-30296

**B**

"The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'"[28] In its briefing to this court, Choice relies on the last of these harms in arguing that the district court erred in dismissing its claims for lack of ripeness, asserting that "[t]he complaint plainly supports a finding that Plaintiffs have been forced to change their conduct as a result of the Act and Policy in order to attempt to avoid the severe new penalties that can arise from the new broader, and ill-defined, set of standards" imposed on OAFs. We conclude that the district court did not err in holding that Choice failed to show that hardship will result from withholding court consideration at this time.

Relying primarily on *Roark & Hardee LP v. City of Austin*,[29] Choice argues that it can satisfy the hardship-prong of the ripeness inquiry because it has been "forced to operate in a heightened state of vigilance" in which it is required to "undertake all steps possible to try to predict which laws the Department will enforce and how it will interpret them, and try to come into compliance with those expectations in order to avoid closure." In *Roark*, this court held that the plaintiffs would suffer hardship if the court denied review of a city ordinance making it a misdemeanor for an owner or operator of a public place to fail to take the necessary steps to prevent or stop another person from smoking.[30] The

---

[28] *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)).

[29] 522 F.3d 533 (5th Cir. 2008).

[30] *Roark*, 522 F.3d at 545.

plaintiffs in *Roark*, however, faced a different situation than that faced by Choice.

In *Roark*, the challenged ordinance imposed a new, affirmative obligation on owners and operators of public places, which created a critical dilemma—a choice between complying with a law thought invalid or continuing to act in a manner believed to be lawful but which could result in future adverse consequences if the law in question were later upheld.[31] With regard to Act 490, there is no such dilemma. Act 490 imposes no new, affirmative obligation on OAFs; OAFs are required to comply with existing and applicable state or federal statutes or regulations regardless of Act 490's existence. There is no dilemma because an OAF does not seek to continue to act in a manner *believed to be lawful* that would violate Act 490; actions violating Act 490 are already *unlawful*. The presence of such a dilemma has been a central feature of cases in which the hardship prong of the ripeness inquiry was held to be satisfied on modification-of-behavior grounds, and its absence here supports our conclusion that Choice will not suffer hardship if court consideration is withheld at this time.[32]

The dissent does not rely on the presence or absence of such a dilemma. Instead, the dissent accepts Choice's argument that it has been forced to modify

---

[31] *See id.* at 539, 545-46 (explaining that the necessary-steps provision was a new restriction that the ordinance placed on owners or operators of public places and describing the plaintiffs' constitutional challenge to its application).

[32] *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152-53 (1967) (relying on the dilemma created by the manufacturers being forced to choose between complying with the regulation and incurring the associated compliance costs or continuing to act in a manner "they believe in good faith meets the statutory requirements, but which clearly does not meet the regulation" and potentially facing more costly criminal and civil penalties); *see also Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) ("If Texas cannot challenge the Procedures in this lawsuit, the State is forced to choose one of two undesirable options: participate in an allegedly invalid process that eliminates a procedural safeguard promised by Congress, or eschew the process with the hope of invalidating it in the future, which risks the approval of gaming procedures in which the state had no input.").

No. 11-30296

its behavior because Act 490's enactment has forced it to operate "in a heightened state of vigilance," explaining that "[t]he coercive impact of Act 490 is already imposing on plaintiffs the burden of attempting to adjust their business practices in response to being uniquely exposed to exceptionally severe penalties for even minor violations of any state or federal law or regulation."[33] While the dissent depicts the "coercive impact" of Act 490 as self-evident, we note that Choice has not identified a single concrete example of how it has been forced to modify its behavior as a result of Act 490.

In its briefing to this court, and during oral argument, Choice argued that it satisfies the hardship prong because the process for challenging an immediate suspension might render it insolvent before its appeal can be heard. Act 490 limits the means by which a licensee may challenge the Secretary's decision to issue an immediate suspension: a licensee is limited to either (1) filing a devolutive appeal with the office of the Secretary or (2) filing for injunctive relief in state district court, in which case the licensee must "prove by clear and convincing evidence that the [S]ecretary's decision . . . was arbitrary and capricious."[34] If an OAF files a devolutive appeal, the suspension remains in effect, closing the business and preventing it from generating revenue during the appeals process. If an OAF seeks an injunction so that it may remain in operation during the appeals process, it must satisfy a heightened standard.

While Act 490 imposes a heightened standard when a licensee seeks to challenge the Secretary's determination that the legal requirements for issuance of an immediate suspension have been satisfied in a specific case, Act 490's heightened standard does not apply to the constitutional claims that Choice has asserted in this case. The dissent fails to acknowledge this distinction. If, in the

---

[33] *Infra* at 28.

[34] LA. REV. STAT. ANN. § 40:2175.6(H)(1)-(2) (Supp. 2012).

No. 11-30296

future, the Secretary issues an immediate suspension of Choice's license based on a determination that Choice is in violation of the law and that the violation "pose[s] an imminent or immediate threat to the health, welfare, or safety of a client or patient," Choice may challenge Act 490's constitutionality, and Act 490's standard of review would not apply to such constitutional claims. Furthermore, Choice would be free to seek a preliminary injunction based on its constitutional claims in order to avoid being closed while it litigates them.[35] The standard requirements for issuance of a preliminary injunction would apply because Choice would not be challenging the Secretary's determination that the legal requirements for issuance of an immediate suspension have been satisfied. It would be challenging the constitutionality of Act 490 itself. Thus, we are not convinced that Choice will suffer hardship if court consideration is withheld at this time.

The dissent asserts that we have clearly erred by failing to appreciate what it considers to be "obvious legal harms."[36] The two legal harms identified by the dissent, which Choice did not rely upon in its appellate briefs, are not as clear as the dissent makes them out to be. The dissent cites three court decisions that repeat language indicating what might constitute legal harm, but in each of those cases, that language explained what the regulation in question was not; the language was not applied to hold that the regulation was ripe for review in the manner that it is used by the dissent.[37] It remains unclear what

---

[35] *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

[36] *Infra* at 17.

[37] *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007).

constitutes "modify[ing] [a] formal legal license,"[38] and one might even question whether modification—as opposed to granting or withholding the license itself—is sufficient, as the case that *Ohio Forestry* purported to paraphrase did not mention modification.[39] None of these three cases holds that legal harm is sufficiently demonstrated when there is a change in the liability imposed for acts already prohibited. Since Choice has elected on appeal to argue that there is sufficient hardship because it has been forced to modify its behavior, we, unlike the dissent, see no need to develop arguments Choice has chosen not to make.

We hold that Choice has not satisfied the hardship prong of the ripeness inquiry. We do not address the fitness of the issues for judicial decision.[40] Because Choice has not satisfied the hardship prong, the district court did not err in concluding that Choice's claims should be dismissed for lack of ripeness.

*     *     *

AFFIRMED.

---

[38] *Ohio Forestry*, 523 U.S. at 733.

[39] *United States v. L.A. & Salt Lake R.R. Co.*, 273 U.S. 299, 310 (1927).

[40] *See Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000) (explaining that hardship must be shown to establish ripeness).

No. 11-30296

DENNIS, Circuit Judge, dissenting:

This court is once again called upon to consider a challenge to a Louisiana abortion law that the state's abortion providers claim singles them out as a disfavored class of medical providers and, among other constitutional defects, has the purpose and effect of creating an undue burden on their patients' rights to choose to terminate their pregnancies. The law challenged here, 2010 Louisiana Acts 490, La. Rev. Stat. § 40:2175.6(G)-(I) ("Act 490" or "the Act"), amended Louisiana's licensing law for abortion clinics by, among other things, subjecting those clinics to uniquely severe civil liability — including revocation or nonrenewal of their operating licenses — for a practically unlimited range of statutory or regulatory violations unrelated to patient health, such as, for example, late tax payments, minor violations of building codes or environmental regulations. However, the majority denies those abortion providers and their patients who are uniquely targeted by the Act an opportunity to challenge its constitutionality in federal court on the basis that their claims are not ripe.

I respectfully dissent because this case presents a concrete dispute between parties advancing squarely adverse positions and is thus ripe for review. "To determine if a case is ripe for adjudication, a court must evaluate (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007). In my view, Act 490 clearly inflicts real and immediate hardships on the plaintiffs. Most conspicuously, Act 490 imposes "legal harms" that satisfy the ripeness doctrine's hardship component, *see id.* at 499, because the Act unambiguously "modif[ies] [Louisiana abortion clinics'] formal legal license[s]," and "subject[s] [them] to . . . civil . . . liability" in the form of severe new civil sanctions, *see Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). In addition to these purely legal harms, the Act also imposes hardship by inflicting "practical harms on the interests advanced by" plaintiffs

13

and because the need to ensure compliance with the Act's strict terms "force[s] [plaintiffs] to modify [their] behavior in order to avoid future adverse consequences." *See Texas*, 497 F.3d at 499 (quoting *Ohio Forestry*, 523 U.S. at 734). Moreover, because plaintiffs' facial constitutional claims present purely legal questions of the kind routinely considered by this court and the Supreme Court, their claims are fit for review without further factual development.

In dismissing as unripe this pre-enforcement challenge to an anti-abortion statute, brought by abortion providers expressly regulated by the law in question, on behalf of themselves and their patients, the majority does for the first time something neither this court nor the Supreme Court has ever done. This result is alarming not only because it constitutes an abdication of the court's obligation to exercise its jurisdiction, but also because it disregards harms to the sensitive and constitutionally-protected interests advanced by plaintiffs. Our precedents do not require us to withhold — and thus likely effectively deny — federal court consideration of plaintiffs' claims.

## I.

In my view, the Act clearly inflicts unconstitutional hardships on the plaintiffs and their patients from whom the federal courts are now deliberately withholding judicial review. The Supreme Court has recognized several categories of harms that "cause [a] part[y] 'hardship' as th[e] Court has come to use that term" in distinguishing ripe controversies from "abstract disagreements." *See, e.g.*, *Ohio Forestry*, 523 U.S. at 733-34, 736; *Texas*, 497 F.3d at 499. Each of these recognized forms of hardship exist here. First, the Act imposes on plaintiffs "purely legal harms" by "modify[ing] . . . [their] formal legal licenses" and "subject[ing] [them] to . . . civil . . . liability." *See Ohio Forestry*, 523 U.S. at 733. Second, the Act "inflicts significant practical harm upon the interests that [plaintiffs] advance[]." *See id.* at 733-34. Finally, the Act

No. 11-30296

"forc[es] [plaintiffs] to modify [their] behavior in order to avoid future adverse consequences." *See id.* at 734.

Under Louisiana's "Outpatient Abortion Facility Licensing Law," La. Rev. Stat. tit. 40, ch.11, pt. VI-A, originally enacted in 2001, an abortion clinic must obtain from the state Department of Health and Hospitals ("the Department") an operating license subject to annual renewal. La. Rev. Stat. Ann. §§ 40:2175.1, 40:2175.4 (2011). Effective June 22, 2010, Act 490 amended several sections of that law governing the suspension, revocation, and non-renewal of these required licenses. *Id.* § 40:2175.6 (2011).

First, the Act vastly broadens the universe of regulatory violations that subject abortion clinics to losing their operating licenses. Prior to Act 490, abortion clinics' licenses were subject to non-renewal, suspension, or revocation under the same conditions as Louisiana hospitals and other health care facilities: that is, only for "a substantial failure . . . to comply with [the statutory licensing] requirements . . . or the rules, regulations and minimum standards adopted by the department." *Id.* § 40:2175.6(G), 40:2110(A) (2009). Moreover, those departmental rules and regulations must have been "reasonably related to" "provid[ing] for the health, safety, and welfare of women in outpatient abortion facilities and for the safe operation of such facilities." *Id.* § 40:2175.2 (2011). Under Act 490, however "[t]he secretary of the department may deny a license, may refuse to renew a license, or may revoke an existing license, if an investigation or survey determines that the applicant or licensee is in violation of [the statutory licensing provisions], in violation of the licensing rules promulgated by the department, *or in violation of any other federal or state law or regulation*," regardless of whether the "federal or state law or regulation" allegedly violated is in any way related to patient health or welfare. *Id.* § 40:2175.6(G) (2011) (emphasis added).

15

Second, the Act permits the Secretary to "issue an immediate suspension of a[n] [abortion clinic's] license" for any such "violation of any . . . federal or state law or regulation, [if] the secretary determines that the violation . . . pose[s] an imminent or immediate threat to the health, welfare, or safety of a client or patient." *Id.* § 40:2175.6(H) (2011). An abortion clinic may only challenge an immediate license suspension under Act 490 by either (1) "fil[ing] a devolutive [non-suspensive] appeal . . . with the office of the secretary," during the pendency of which appeal the license suspension remains in effect, *id.* § 40:2175.6(H)(1) (2011); or (2) "fil[ing] for injunctive relief . . . [in state] district court . . . [and] prov[ing] by *clear and convincing* evidence that the secretary's decision to issue the immediate suspension of the license was *arbitrary and capricious*," *id.* § 40:2175.6(H)(1) (2011) (emphasis added). Prior to Act 490, the state could only revoke or suspend the license of an abortion clinic, as with respect to any other licensed entity, pursuant to the more rigorous procedural safeguards set forth in Louisiana's Administrative Procedure Act, La. Rev. Stat. tit. 49, ch. 13. *See, e.g.*, *id.* § 49:961, 49:964 (2011) (providing that a state "court may reverse or modify [an agency's] decision" to summarily suspend a license on several grounds, including because the decision is "[n]ot supported . . . by a preponderance of the evidence"). Act 490's more exacting "arbitrary and capricious" by "clear and convincing evidence" standard supersedes these generally applicable procedural requirements with respect to abortion clinics, as the Secretary's immediate suspension authority and the reduced procedural safeguards that accompany it subject abortion clinics to immediate closure "[n]otwithstanding any law to the contrary." *Id.* § 40:2175.6(H) (2011).

Third, the Act for the first time authorizes the Secretary to permanently "prohibit[]" "any owner, officer, member, manager, director, or administrator" of an abortion clinic whose "license is revoked or [license] renewal . . . is denied" for any violation of any federal or state law or regulation "from owning, managing,

directing, or operating another outpatient abortion clinic in the state of Louisiana." *Id.* § 40:2175.6(I) (2011). Prior law did not authorize any such lifetime ban on an individual associated with a shuttered clinic. *See id.* §§ 40:2175.6, 40.2110 (2009).

In view of these stark and drastic changes to the regulatory regime governing Louisiana's outpatient abortion facilities, I turn to the hardship analysis.

## A.

The majority's clearest error is its failure to appreciate the obvious legal harms that the terms of Act 490 unambiguously impose on Louisiana abortion providers.[1] In the context of a challenge to the provisions of a regulatory scheme, such as that at issue here, hardship will often result first and foremost from the "adverse effects of a strictly legal kind" inherent in the provisions at issue. *Ohio Forestry*, 523 U.S. at 733. The Supreme Court has explained that such legal harms inhere in laws or regulations that, for example, "command [some]one to do . . . or to refrain from doing [some]thing; . . . grant, withhold, or modify any formal legal license, power, or authority; . . . subject [some]one to . . . civil or criminal liability; [or] create . . . legal rights or obligations." *Id.*; *accord Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003) (recognizing that "adverse effects of a strictly legal kind" may amount to "a showing of hardship" where a regulation, inter alia, "modif[ies] [a plaintiff's]

---

[1] The majority suggests that it need not fully reckon with this first basis for justiciability because the plaintiffs did not advance it in their briefs. Majority Opinion 14. However, it is well established that this court, like "every federal appellate court[,] has a special obligation to 'satisfy itself of its own jurisdiction.[']" *Bender v. Willamsport Area Sch. Distr.*, 475 U.S. 534, 541 (1986); *see New Orleans Pub. Serv., Inc. v. City Council of New Orleans*, 491 U.S. 350, 358 (1989) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)); *see also, e.g.*, *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (raising the issue of Article III standing sua sponte and articulating reasons why the plaintiffs had standing to sue).

formal legal license" or "subject[s] [a plaintiff] to . . . civil . . . liability" (quoting *Ohio Forestry*, 523 U.S. at 733)); *see also Texas*, 497 F.3d at 499 (recognizing that "[t]he Supreme Court has found hardship to inhere in legal harms"). At least two of these "adverse effects of a strictly legal kind" are implicated by the provisions challenged in this case: (1) the legal harm imposed by a statute that "modif[ies] [one's] formal legal license"; and (2) that imposed by a statute that "subject[s] [one] to . . . civil or criminal liability." *See Ohio Forestry*, 523 U.S. at 733.

First, Act 490 unequivocally "modif[ies] [plaintiffs'] formal legal license[s]" by expressly amending Louisiana's "Outpatient Abortion Facility Licensing Law" to  impose retroactively harsh new conditions on abortion clinics' operating licenses, staffs, and plants, and by subjecting them to numerous additional grounds for suspension, revocation, and non-renewal. The operating licenses at issue are surely formal legal licenses of the kind contemplated by the Supreme Court in *Ohio Forestry*. *See id.*; *see also* La. Rev. Stat. Ann. § 40:2175.4 (requiring abortion clinics to obtain operating licenses subject to annual renewal). "A license is 'a right or permission granted in accordance with law . . . to engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful.'" *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1978 (2011) (alteration in original) (quoting Webster's Third New Int'l Dictionary 1304 (2002))); *see also* Black's Law Dictionary, license (9th ed. 2009) (defining "license" as "[a] permission, usu[ally] revocable, to commit some act that would otherwise be unlawful"). It is equally clear that Act 490 modified those licenses by expressly conditioning their continued validity on strict compliance with an enormous number of regulations. *Compare* La. Rev. Stat. Ann. § 40:2175.6(G) (2012) (authorizing the Secretary to suspend, revoke, or not renew an abortion clinic's license for, inter alia, any violation of any state or federal law or regulation), *with id.* § 40:2175.6(G) (2009)

No. 11-30296

(prior to amendment by Act 490) (permitting suspension, revocation, or non-renewal of the licenses of abortion clinics only for a substantial failure to comply with Louisiana licensing requirements or health and safety regulations), *and id.* § 40:2110(A) (continuing to require a showing of "substantial failure . . . to comply" for the denial, suspension, or revocation of other hospital and health care facilities); *see also MCI Telecommc'ns. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion."); Black's Law Dictionary, modification (9th ed. 2009) (defining "modification" as "qualification or limitation of something").[2]

Second, Act 490 just as plainly "subject[s] [abortion clinics and their directors] to . . . civil . . . liability" by attaching new and more severe sanctions

---

[2] Courts have routinely adjudicated the merits of analogous pre-enforcement constitutional challenges to licensing laws. In *Whiting*, the Supreme Court reached the merits of a suit in which plaintiffs "filed a preenforcement suit . . . argu[ing] that [an] Arizona law[] . . . allowing the suspension and revocation of business licenses for employing unauthorized aliens were both expressly and impliedly preempted by federal immigration law," despite the fact that "[n]o suits had been brought under the Arizona law when the complaint . . . was filed." *Whiting*, 131 S. Ct. at 1977 & n.4. In an equal protection challenge to a state law that allegations that a state licensing scheme discriminates between similarly-situated entities are "sufficient . . . to survive a motion to dismiss" in the context of standing doctrine's analogous "injury-in-fact requirement." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012). We explained: "Discriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable. And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation. Here, the Act facially discriminates against the [TCA's] membership by extending the benefit of a state-wide license to its competitors while denying that same benefit to incumbent cable providers. . . . [S]uch discrimination can constitute an injury because it positions similar parties unequally before the law; no further showing of suffering based on that unequal positioning is required for purposes of standing." *Id.* Other courts have reached similar results. *See, e.g.*, *Friendship Med. Ctr., Ltd. v. Chicago Bd. of Health*, 505 F.2d 1141, 1145-46 (7th Cir. 1974) (holding pre-enforcement challenge to registration requirements for abortion providers justiciable where "[t]he regulations . . . provided for the closing of any abortion service that . . . would be in violation of any of the Board of Health's regulations" and where the defendants "ha[d] the power to deny authorization to those seeking to operate an abortion facility as well as the power to order the closing of any facility that it deems not in compliance with its regulations").

to the vast array of all existing state and federal laws and regulations. To reiterate, under the Act, *any* violation of *any* state or federal law or regulation now for the first time subjects Louisiana's abortion clinics to the civil sanctions of suspension, revocation, or non-renewal of their operating licenses, regardless of whether the violation is substantial or whether the law or regulation violated in any way relates to the provision of medical services. La. Rev. Stat. Ann. § 40:2175.6(G); *see also Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (explaining that a statute authorizing revocation of an abortion provider's license "carr[ies] [a] potentially significant civil . . . penalt[y], . . . which can be characterized as quasi-criminal," such that the "statute must define its terms . . . in a manner that does not encourage arbitrary and discriminatory enforcement"). The Act further permits the Secretary to immediately suspend an abortion clinic's license upon a finding of an imminent threat to patient health or welfare, subject to judicial review only under a doubly exacting burden of proving by "clear and convincing evidence" that summary suspension "was arbitrary and capricious." *Id.* § 40:2175.6(H)(1). Moreover, under the Act, any clinic operator whose license is revoked or not renewed for any such violation of any state or federal law or regulation is now, for the first time, subject to the civil sanction of being prohibited from again "operating another outpatient abortion facility in the state of Louisiana." *Id.* § 40:2175.6(I).

These changes in law amount to "subjecting [abortion providers] to civil . . . liability" by subjecting them to loss of licensure at the will of the Secretary and thus constitute severely injurious legal harm. *See Ohio Forestry*, 523 U.S. at 733. Indeed, the Supreme Court recently reiterated that "[l]icense suspension and revocation are significant sanctions," and referred to "[l]icense termination" as "the business death penalty." *Whiting*, 131 S. Ct. at 1983-84; *see also Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (2008) (holding ripe plaintiffs' claims where violation of challenged "ordinance [could] subject [plaintiffs] to

heavy fines . . . and possible revocation of their licenses and permits"); *cf. id.* at 546 (distinguishing *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967), on the basis that the regulation challenged in that case did not provide for "adverse consequences, such as 'heavy fines'" (quoting *Toilet Goods*, 387 U.S. at 164-65)); Black's Law Dictionary, liability (9th ed. 2009) (defining "liability" as "[t]he quality or state of being legally obligated or accountable; [or] legal responsibility to another or to society, enforceable by civil remedy or criminal punishment").

The precise provisions of the Act that plaintiffs challenge as unconstitutionally vague, discriminatory, and arbitrary, and as having the purpose or effect of infringing on the abortion right, plainly "create adverse effects of a strictly legal kind" by modifying the conditions by which abortion clinics may retain their legal licenses and by subjecting clinics and their operators to severe civil liability. *See Ohio Forestry*, 523 U.S. at 733. Thus, plaintiffs will suffer severe hardships if we withhold judicial review of their claims. *See id.* It is therefore unnecessary to consider whether the Act imposes additional harms by "inflict[ing] significant practical harm upon the interests that [plaintiffs] advance[]," *id.*, and "affect[ing] [their] primary conduct," *Natl'l Parks Hospitality Ass'n*, 538 U.S. at 810, by "forc[ing] [them] to modify [their] behavior in order to avoid future adverse consequences," *Ohio Forestry*, 523 U.S. at 734. That plaintiffs also suffer those forms of harm greatly amplifies the prejudicial effects of the majority's error.

**B.**

In addition to recognizing the purely legal harms that may inhere in the terms of a challenged regulation, the Supreme Court has also explained that a plaintiff can establish hardship by demonstrating that a regulatory scheme "inflicts significant practical harm upon the interests that [the plaintiff] advances." *Ohio Forestry*, 523 U.S. at 733 (emphasis added); *accord Texas*, 497 F.3d at 499. The Court stressed that such practical harms constitute "an

important consideration in light of th[e] Court's modern ripeness cases." *Id.* at 733-34 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 152-54 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). The Court explained that identifying this type of "practical harm" involved considering whether there exists a "strong reason why the [plaintiff] must bring its challenge now in order to get relief" or whether, on the contrary, the plaintiff "w[ould] have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Id.* at 734. The Court cited its ripeness discussion in *Abbott Labs* as an illustration of this sort of practical harm to the interests that a party seeks to advance through the litigation. *Id.* at 733-34 (citing *Abbott Labs.*, 387 U.S. at 152-54). In the relevant portion of *Abbott Labs*, the Court had reasoned that to "[t]o require [the plaintiffs there, regulated entities specifically targeted by the regulations at issue] to challenge the[] regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily." *Abbott Labs.*, 387 U.S. at 154. The plaintiff in *Ohio Forestry*, on the other hand, was in no danger of being placed in the position of only being able to challenge the preliminary forestry management plan at issue in that case in response to an action brought against them by the government; rather, the plaintiff, an environmental organization, would have "ample opportunity later to bring its legal challenge" if and when subsequent regulatory developments actually authorized the logging operations that the organization was ultimately concerned about. *Ohio Forestry*, 523 U.S. at 734; *see also id.* at 729-30 (listing the numerous policymaking steps the agency would have had to undertake before such authorization could be issued); *cf. Abbott Labs.*, 387 U.S. at 152 (indicating that, unlike the preliminary administrative plan challenged in *Ohio Forestry*, the regulations at issue in *Abbott Labs* "ha[d] the status of law and violations of them carr[ied] heavy criminal and civil sanctions"; that "[t]he regulations . . . were made effective immediately upon publication[] . . . [and]

No. 11-30296

immediate compliance with their terms was expected"; and that the defendant "agency . . . ha[d] direct authority to enforce th[e] regulation[s]").

Here, Act 490 "now inflicts significant practical harms upon the interests that [plaintiffs] advance," such that there are "strong reason[s] why [plaintiffs] must bring [their] challenge[s] now in order to get relief." *See Ohio Forestry*, 523 U.S. at 733-34. Even more than the drug manufacturers in *Abbott Labs*, plaintiffs here "deal in a sensitive industry," the nature of which is such that "[t]o require them to challenge these regulations only as a defense to an action brought by the [g]overnment might harm them severely and unnecessarily." *See Abbott Labs.*, 387 U.S. at 153; *see also Doe v. Bolton*, 410 U.S. 179, 188 (1973) (concluding that abortion providers "against whom [abortion regulations] directly operate" but who had not "been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes[,] . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief" on their constitutional claims). Unlike the situation in *Ohio Forestry*, there are no more procedural steps that the Department must go through before taking immediate action to the enforce the terms of Act 490 against one or more of the plaintiffs, *see Ohio Forestry*, 523 U.S. at 734; rather, the new licensure conditions are "immediately effective" and "direct[ly] . . . enforce[able]" by the Department, *see Abbott Labs.*, 387 U.S. at 152.

Plaintiffs assert that withholding judicial consideration of their claims may lead to one or more abortion clinics being shut down pursuant to the immediate suspension authority created by Act 490, likely driving the affected clinics out of business and disrupting those clinics' patients' ability to exercise constitutionally protected rights. Plaintiffs allege that the extremely demanding injunction standard imposed by the Act — which requires plaintiffs to "prove by 'clear and convincing evidence that the secretary's decision to issue [an] immediate suspension of the license was arbitrary and capricious'" — "is

designed to preclude meaningful judicial review that would otherwise be available to all other licensed medical facilities." Complaint 16; *see also id.* (alleging that, "at a hearing before the Louisiana House Health & Welfare Committee, . . . [the] Department Executive Counsel[] conceded that no other [Louisiana] statute or regulation . . . requires a showing by clear and convincing evidence that an agency acted in an arbitrary and capricious manner to obtain injunctive relief from a court"). The majority acknowledges that, under Act 490, "the process to challenge an immediate suspension [action brought pursuant to § 40:2175.6(H)] is limited" to devolutive appeals and injunction proceedings in which the clinic "must satisfy a heightened standard" of review, but nonetheless concludes that "[it is] not convinced that [plaintiffs] will suffer hardship if court consideration is withheld at this time." Majority Opinion 10-11. This reasoning ignores the constitutionally protected status of the services at issue, the time-sensitive nature of the abortion right, and Act 490's chilling effect on the provision of those services and the exercise of that right.

Plaintiffs should not be "require[d] . . . to challenge [the Act] only as a defense to an action brought by the [state]," whether in the form of an "immediate suspension" action under § 40:2175.6(G) or a suspension, revocation, or nonrenewal decision for, inter alia, a "violation of any . . . federal or state law or regulation" under § 40:2175.6(H). *See Abbott Labs.*, 387 U.S. at 153; *see also Texas*, 497 F.3d at 499 ("If [plaintiff] cannot challenge the [p]rocedures [at issue] in this lawsuit, [it] is forced to choose one of two undesirable options: participate in an allegedly invalid process that eliminates a [previously available] procedural safeguard . . . , or eschew the process with the hope of invalidating it in the future[] . . . ."). Pre-enforcement facial challenges seeking declaratory and injunctive relief have long proceeded as an accepted means for abortion providers and their patients to challenge the constitutionality of regulations touching on the abortion right. *See, e.g., Sabri v. United States*, 541 U.S. 600,

609-10 (2004) (recognizing the validity of pre-enforcement facial attacks in only a "few settings," including abortion, based "on the strength of specific reasons weighty enough to overcome [the Supreme Court's] well-founded reticence" to entertain such attacks generally (citing *Stenberg v. Carhart*, 530 U.S. 914, 938–946 (2000)).  Pre-enforcement review prevents potentially impermissible regulations from inflicting a chilling effect on the ability of women to exercise their right to choose to terminate their pregnancies prior to fetal viability.  *See Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1466-67 (8th Cir. 1995) ("[P]otential civil liability . . . is more than enough to chill the willingness of physicians to perform abortions . . . ."); *see also Okpalobi v. Foster*, 244 F.3d 405, 435 (5th Cir. 2001) (en banc) (Benavides, J., concurring in part and dissenting in part) (stating that the "true injury" of a statute imposing potential civil liability on abortion providers is "the 'chilling' of a woman's constitutional right to choose an abortion").

Such pre-enforcement challenges are critical in this context because of the time-sensitive nature of the abortion right.  States may "restrict abortions after fetal viability."  *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992).  And, although "viability" is something of an evolving measure for when such restrictions are permissible — "advances in neonatal care have advanced viability to a somewhat earlier point" — the Supreme Court has stated that, in "the scheme of time limits on the realization of competing interests, . . . viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions"; this is so "whenever [viability] may occur."  *Id.* at 860.  Louisiana prohibits post-viability abortions, *see* La. Rev. Stat. §§ 37:1285(A)(8)(a), 40:1299.35.2, 40:1299.35.4, and defines "viability" as "that stage of fetal development when, in the judgment of the physician based upon the particular facts of the case before him, and in light of the most advanced medical

technology and information available to him, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his mother, with or without artificial support," *id.* § 40:1299.35.1(10). Thus, pre-enforcement review is essential to protect the interests, advanced by plaintiffs here, of their patients who seek to exercise their constitutional right to choose to obtain a pre-viability abortion. The majority's erroneous refusal to permit such judicial review exposes those patients to the very real possibility that their clinic may be shut down for a potentially unconstitutional reason during the only window of time during which they may exercise their constitutional right.

Accordingly, "[t]o require [plaintiffs] to challenge these regulations only as a defense to an action brought by the [g]overnment might harm them severely and unnecessarily." *Abbott Labs.*, 387 U.S. at 153. This "strong reason why [plaintiffs] must bring [their] challenge[s] now in order to get relief" amounts to a "significant practical harm upon the interests that [plaintiffs] advance[]," and thus satisfies the hardship requirement. *See Ohio Forestry*, 523 U.S. at 733-34; *Texas*, 497 F.3d at 499.

## C.

The majority further errs in concluding that 490 has not "force[d] [plaintiffs] to modify [their] behavior in order to avoid future adverse consequences." *See Ohio Forestry*, 523 U.S. at 734; *accord Texas*, 497 F.3d at 499. The Supreme Court explained that such hardship can occur when, "for example, . . . regulations . . . force immediate compliance through fear of future sanctions." *Ohio Forestry*, 523 U.S. at 734. In doing so, the Court cited cases in which plaintiffs faced a choice of complying with the challenged scheme or "risking later . . . civil penalties," such as "later loss of license." *Id.* (citing *Abbott Labs.*, 387 U.S. at 152-53; *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 417-419 (1942)); *see also Abbott Labs.*, 387 U.S. at 152-53 (explaining that the plaintiffs in the ripe controversy there had to choose

No. 11-30296

between shouldering compliance costs or "risk[ing,] [inter alia,] serious . . . civil penalties" for violating the challenged scheme).

Here, Plaintiffs challenge the validity and rationality of the harsh new consequences Act 490 attaches to a practically limitless universe of legal and regulatory violations. Plaintiffs assert that by uniquely exposing them to the prospect of such penalties, Act 490 effectively requires them to adopt more vigilant policies and procedures regarding the innumerable state and federal laws and regulations incorporated by reference under the penalty provisions of Act 490, in an effort to avoid even minor violations. By doing so, the Act "force[s] [plaintiffs] to modify [their] behavior in order to avoid future adverse consequences." *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (internal quotation marks omitted) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733-34 (1998)).

The majority relies wholly on the distinction that although Act 490 attaches severe new *penalties* to existing regulations, it does not itself create new "affirmative obligations," that is, new regulations of primary conduct. I disagree that this peculiarity in the design of Act 490 renders inconsequential the fact that plaintiffs have been forced to modify their business practices in an effort to avoid the enormous range of newly-created ground for loss of licensure. The Supreme Court has specifically described the harm imposed by a regulation that "affect[s] a [plaintiff's] primary conduct" as a distinct type of harm from the "strictly legal kind" of harm imposed by a regulation that "commands [the plaintiff] to do [some]thing or refrain from doing [some]thing." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 809-10; *accord Ohio Forestry*, 523 U.S. at 733-34. A state's imposition of severe new consequences for violations of existing regulations may "force immediate compliance through fear of future sanctions." *Ohio Forestry*, 523 U.S. at 734. Indeed, it is difficult to imagine what legitimate purpose Act 490 could have if it is not meant to effect precisely the kinds of

27

No. 11-30296

heightened compliance measures plaintiffs realistically assert they have been forced to undertake.[3]

The coercive impact of Act 490 is already imposing on plaintiffs the burden of attempting to adjust their business practices in response to being uniquely exposed to exceptionally severe penalties for even minor violations of any state or federal law or regulation. Here, as in *Abbott Labs*, the challenged "regulation is directed at [plaintiffs] in particular; it require[s] them to make significant changes in their everyday business practices; [and] if they fail to observe the . . . rule they are quite clearly exposed to the imposition of strong sanctions." *See Abbott Labs.*, 387 U.S. at 154. Therefore, the majority is wrong to conclude that the compliance burdens on plaintiffs do not constitute a cognizable hardship.[4]

---

[3] As plaintiffs' counsel noted at oral argument, were a state to condition the licensure of attorneys — or, to more closely track the circumstances this case, of some disfavored category of attorneys — on strict compliance with *all* state and federal laws, it seems indisputable that such a law would impose on that category of disfavored practitioners the hardship of modifying their customary conduct in order to avoid the uniquely severe sanctions that, for example, a speeding ticket would subject them to.

[4] The burdens imposed on plaintiffs here are at least as real and immediate as what every member of this court en banc seemingly recognized as having been inflicted on abortion providers by the passage of an earlier Louisiana law that "exposes [abortion] doctors to unlimited tort liability" in private suits, in part by exempting civil suits brought pursuant to that law from the limitations on liability provided in Louisiana's generally applicable Medical Malpractice Act. *Okpalobi v. Foster*, 244 F.3d 405, 409, 421-22 (5th Cir. 2001) (en banc); *see also K.P. v. LeBlanc*, 627 F.3d 115, 119-20 (5th Cir. 2010); La. Rev. Stat. Ann. § 9:2800.12. Although the en banc court deemed the suit non-justiciable as having been brought against the wrong defendants, it appears that every member of the court agreed that the "self-enforcing nature" of the statute at issue had an "immediate coercive effect" on abortion providers and that this "coercive impact of the statute itself" amounted to an injury-in-fact for purposes of Article III standing. *Okpalobi*, 244 F.3d at 427 (explaining that the "impact of the statute" is "coercive in that it exposes [abortion physicians] to unlimited tort liability"); *id.* at 435 (Benavides, J., concurring in part and dissenting in part) (agreeing that "Act 825, by its mere existence, coerces the plaintiffs to abandon the exercise of their legal rights lest they risk incurring substantial civil liability"); *id.* at 451 (Parker, J., dissenting) (agreeing that the plaintiffs "undoubtedly established an 'injury-in-fact'"); *see also Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) (explaining that the standing injury-in-fact inquiry and the ripeness hardship inquiry "overlap in practice," as each amounts to "an examination of whether a plaintiff has suffered a concrete injury").

28

No. 11-30296

## II.

Finally, plaintiffs' claims present purely legal questions that are plainly fit for judicial decision without awaiting further factual developments. Claims are "ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010). "[N]o further factual development is necessary," if the only claims call for "purely legal inquiries." *Roark*, 522 F.3d at 546.

Plaintiffs bring facial challenges on constitutional grounds that present purely legal questions regarding the validity of the Act as written. Specifically, plaintiffs claim that the Act: (1) violates due process because its authorization of license revocation for any violation of any state or federal law or regulation fails to give outpatient abortion facilities fair notice of the conditions of their licensure and encourages arbitrary and discriminatory enforcement; (2) violates equal protection by treating abortion clinics differently than other medical facilities without a rational basis; (3) violates due process because its immediate suspension provision deprives clinics of liberty and property interests in an arbitrary, unreasonable, and capricious manner and invests an impermissible degree of subjective discretion in the Secretary; and (4) violates the constitutional abortion right because it has the purpose or effect of placing a substantial obstacle in the path of pregnant patients seeking to obtain pre-viability abortions. Adjudication of these claims would require analysis of the terms of the Act, and evidence of legislative intent, applying the relevant constitutional doctrines. A court's ability to make such determinations does not depend on the occurrence of any future events.

This court has previously reached questions regarding the merits of such claims or held similar challenges justiciable. In *Women's Medical Center of Northwest Houston*, we reviewed a district court's temporary injunction of a

Texas law amending that state's abortion licensing law. 248 F.3d at 413, 419-22. We considered the likelihood of success of equal protection and vagueness challenges very similar to those brought by plaintiffs here. *Id.* at 419-22. With respect to the equal protection challenges, the court explained that, because "[t]he record contain[ed] no evidence of anti-abortion animus, and no evidence that the . . . amendments were passed in an attempt to limit abortion access or for any other improper purpose[,] . . . the district court correctly chose to evaluate the . . . amendments as health and safety regulations subject to rational basis review." *Id.* at 419. The court then proceeded to apply the rational basis analysis to the challenged statutory provision, concluding that the amendments were not "substantially likely to fail rationality review." *Id.* at 419-21. The court then applied vagueness principles to the text of the challenged amendments, and concluded that "the plaintiffs . . . established a substantial likelihood of success on their vagueness challenge to the subject provisions," reasoning that, "[e]specially in the context of abortion, a constitutionally protected right that has been a traditional target of hostility, standardless laws and regulations such as these open the door to potentially arbitrary and discriminatory enforcement." *Id.* at 421-22. We specifically explained that our conclusion was not altered by the fact that "no abortion facility has yet been subjected to civil or criminal penalties for violating these regulatory provisions." *Id.* at 422; *see also Time Warner Cable*, 667 F.3d 630, 636 (5th Cir. 2012) ("Discriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable. And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation. . . . [S]uch discrimination can constitute an injury because it positions similar parties unequally before the law; no further showing of suffering based on that unequal positioning is required . . . ." (second alteration in original)).

Similarly, in *Roark*, we held ripe a facial procedural due process challenge to the "enforcement provision" of a municipal anti-smoking ordinance "giving the city manager discretion to revoke permits and licenses," even though "the City ha[d] not enforced the challenged fine or license revocation penalties against any Plaintiff." 522 F.3d at 544-46. We explained that "no further factual development [was] necessary" in order "[t]o determine the merits of" the procedural due process claim because adjudication would present a "purely legal inquir[y]." *Id.* at 546.

And in *K.P. v. Leblanc*, we considered sua sponte the justiciability of facial vagueness, equal protection, and undue burden challenges to another Louisiana statute regulating abortion providers. 627 F.3d at 122. That statute subjects providers to potential civil liability in the form of private lawsuits, and exempts such suits from the limitations on liability that protect other physicians under the state's generally applicable medical malpractice statute. *Id.* Again, we held the claims justiciable even though the abortion providers' "liability for suits . . . ha[d] not yet materialized." *Id.*

Moreover, the Supreme Court has repeatedly reached the merits of pre-enforcement facial challenges to regulations of abortion providers. *E.g.*, *Gonzalez v. Carhart*, 550 U.S. 124, 161-68 (2007) (vagueness, substantive due process); *Stenberg v. Carhart*, 530 U.S. 914, 929-46 (2000) (substantive due process); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879-901 (1992) (substantive due process); *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 517-518 (1990) (procedural due process); *Doe*, 410 U.S. at 192-201 (vagueness, substantive due process, equal protection).

Because adjudication of plaintiffs' claims would involve only the application of familiar constitutional doctrines to statutory provisions and indications of legislative intent, "[a]dditional fact-finding would not aid [judicial] inquiry into the purely legal question of [the Act's] validity." *See Texas*, 497 F.3d

No. 11-30296

at 499.[5] Accordingly, the district court and the majority have erred in concluding that plaintiffs' purely legal claims are unfit for judicial resolution.[6]

## III.

The majority's procrustean ripeness analysis would be unprecedented in any case. It is particularly inappropriate in a pre-enforcement challenge to an abortion regulation. As this court has recognized, the Supreme Court has flexibly applied justiciability doctrines in abortion cases. *See Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986) (noting that "the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases" (citing *Roe*, 410 U.S. at 123-29; *Doe*, 410 U.S. at 187-89)); *accord Okpalobi*, 244 F.3d at 427-28; *see also, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) ("conclud[ing] that it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision"); *Roe*, 410 U.S. at 125 (recognizing a mootness exception for abortion

---

[5] The Secretary's counsel intimates that the Secretary may not ultimately exercise his considerable — and allegedly impermissible — discretion "under Act 490 in the draconian fashion [plaintiffs] fear" by initiating suspension or revocation proceedings against a clinic, or declining to renew its license, for a minor or non-health-related regulatory violation. *See* Appellee's Br. 20. These assertions do not change the analysis. Even were the Secretary's counsel to go farther and *assure* the court that the Secretary would not exercise his authority under the Act in an arbitrary fashion, such assurances would be irrelevant. In *Abbott Labs*, the Court rejected the government's "contention that the threat of [certain] sanctions for noncompliance with [the] . . . regulation [at issue] is unrealistic," although government counsel had asserted that the feared sanction would not be imposed. *Abbott Labs.*, 387 U.S. at 154. Where an "action at its inception [is] properly brought[,] . . . subsequent representation[s] of [the defendant's counsel will] not suffice to defeat it." *Id.*

[6] Importantly, the Supreme Court has explained that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974)); *accord, e.g.*, *Neal v. Shimoda*, 131 F.3d 818, 825 (9th Cir. 1997). The circumstances surrounding the present case indicate that the Secretary has already subjected several abortion clinics in the state to the harsh terms of the new Act, and intends to enforce the Act again the plaintiff clinics. Thus, plaintiffs claims would be fit for adjudication even if they did not present purely legal questions.

litigation because "pregnancy . . . truly could be 'capable of repetition, yet evading review'"); *cf. Sabri*, 541 U.S. at 609-10 (2004) (stating that weighty concerns justify entertaining pre-enforcement facial attacks in the abortion setting). In evaluating the ripeness of a facial challenge to an abortion regulation, as in applying the other justiciability doctrines in such a case, "[o]ur law should not be [so] rigid" as to "effectively den[y] [judicial] review." *See Roe*, 410 U.S. at 125.

## IV.

In sum, the present controversy raises concrete legal issues regarding the validity of an already-effective statute, contested by classically adversarial parties: the regulated entities expressly subject to the challenged law and the state actor with the undisputed authority to enforce that law against them. It is thus far from the sort of abstract or hypothetical dispute that Article III's case or controversy requirement prohibits federal courts from adjudicating. The majority overlooks clear legal harms, sufficient to make this controversy ripe for review, that the challenged Act imposes explicitly and uniquely on Louisiana abortion providers and consumers such as the plaintiffs here. In doing so, the majority applies a novel and excessively rigid formulation of the ripeness doctrine's hardship requirement. Particularly troubling is that it does so in the context of a pre-enforcement challenge to an abortion regulation, a context in which the Supreme Court has repeatedly reached the merits of constitutional claims, and has applied the justiciability doctrines so as not to effectively deny a federal forum to challenges to regulations implicating the constitutional right to choose to terminate a pre-viability pregnancy.

Because I strongly disagree with the rigid formulation of the ripeness doctrine's hardship component that the majority applies, and with the erroneous conclusion it reaches, I respectfully dissent.